**UNITED STATES of America, Appellee,**

v.

**Ernesto LOPEZ, Defendant-Appellant.**

**Nos. 861, 953, Dockets 75–1023, 75–1024.**

United States Court of Appeals, Second Circuit.

Argued April 28, 1975.

Decided June 26, 1975.

Certiorari Denied Dec. 1, 1975. See 96 S.Ct. 421.

Peter M. J. Reilly, Jr., Islip, N. Y., for defendant-appellant.*

Paul F. Corcoran, Asst. U. S. Atty. (David G. Trager, U. S. Atty. for the Eastern District of New York, Paul B. Bergman, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Jack Wasserman, Washington, D. C. (Esther M. Kaufman, Atty., Washington, D. C., Donald L. Unger, San Francisco, Cal., amicus Committee), for amicus curiae Association of Immigration and Nationality Lawyers.

Before MOORE and MANSFIELD, Circuit Judges, and HOLDEN, District Judge.*

**MANSFIELD, Circuit Judge:**

For eight days Ernesto Lopez was tried in the Eastern District of New York before Judge Thomas C. Platt and a jury upon an indictment charging him in 20 counts with harboring aliens illegally present in the United States, in violation of Title 8 U.S.C. § 1324(a)(3).[1] After the government rested its case the court denied Lopez's motions to dismiss the indictment on the grounds that his conduct as established by the government's proof did not constitute harboring within the meaning of § 1324(a)(3) and that the statute was unconstitutional. Thereupon Lopez pleaded guilty to a superseding information charging him with conspiracy to harbor illegal aliens in violation of § 1324(a)(3). In pleading guilty to the information Lopez reserved the right, with the court's permission, to appeal from its rulings on his motions.[2] We affirm.

The proof introduced by the government at trial, which was not refuted by Lopez, revealed that he owned several

* Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

1. Section 1324(a) provides:
   "Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—
   (1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;
   (2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;
   (3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or
   (4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of—
   any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring."

2. The indictment also contained three counts charging Lopez with the making of false statements to a governmental agency in violation of Title 18 U.S.C. §§ 1001 and 1546. Subsequently on September 19, 1974, two additional indictments were filed charging conspiracy to obstruct justice.
   Upon his plea of guilty to the charge of conspiracy Lopez was sentenced to a term of four years and to payment of a $10,000 fine, execution of which was stayed pending appeal.

single family houses in the Levittown-Westbury area of Nassau County, which appellant had operated as havens for aliens who had illegally entered the United States. Appellant admitted knowledge of the alienage of these individuals. Each alien paid him $15 per week for use of one of these refuges as living quarters. Before their illegal border crossings several of the aliens had been furnished with addresses of houses owned by Lopez and, upon making their illegal entry into the United States, had proceeded directly to appellant's houses, where they were received and lodged. Upon a search pursuant to a warrant of six of these houses on July 23, 1974, investigators of the Immigration and Naturalization Service (INS) found 27 illegal aliens residing on the premises.

In addition to providing lodging to large numbers of aliens with knowledge of their illegal entry, appellant had assisted many of them in other ways designed to facilitate their continued unlawful presence in the United States. He had helped some to obtain employment by personally filling out job applications on their behalf and by transporting them in vans to and from work. In return for payment to him of substantial sums of money by others Lopez, as a means of enabling them to assume the guise of an apparently lawful status in the United States, had arranged sham marriages, i. e., ceremonies for marriages that were not consummated, with the participants parting immediately after the ceremony.

## DISCUSSION

The principal issue raised by this appeal is the construction of the word "harbor" as it is used in § 1324(a)(3), which provides that any person who "wilfully or knowingly conceals, harbors, or shields from detection or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation   .   .   . any alien including an alien crewman not duly admitted by an immigration officer or not lawfully entitled to enter or re-side within the United States under the terms of this chapter   .   .   . shall be guilty of a felony   .   .   .."

■ Lopez contends that merely providing shelter to an alien with knowledge of his illegal presence in the United States is insufficient to constitute harboring within the meaning of § 1324(a)(3); in addition, he argues, the government must prove that the conduct is part of the process of smuggling of the aliens into the United States or directly connected with the alien's illegal entry. Such a nexus would presumably be established by showing that the shelter was provided clandestinely or for the purpose of concealing the alien from immigration authorities.

In support of his interpretation of § 1324 Lopez points to its legislative history. As originally enacted by Congress in 1907 that statute prohibited simply the smuggling or unlawful bringing of aliens into the United States. In 1917 it was amended by Congress to add as a crime the concealment or harboring of illegal aliens. See 39 Stat. 880. However, the penalty provisions applied only in terms of the crime of landing or bringing unauthorized aliens into the country, with no punishment attaching to the crime of concealing or harboring them. In *United States* v. *Evans*, 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948), the Supreme Court declined to remedy this defect by judicial construction, holding that congressional revision of the statute was required to punish the separate crime of concealing and harboring illegal aliens. The Court based its decision in part on the ground that the penalties to be imposed might vary according to the construction of the terms "concealing" and "harboring," which could be broadly interpreted to encompass more than the "chain of offenses consisting of successive stages of the smuggling process" and to include "offenses distinct and disconnected from smuggling operations," such as providing shelter to an alien lawfully admitted but unlawfully remaining within the country, 333 U.S. at 488, 68 S.Ct. at 637.

Speaking for a unanimous Court Justice Rutledge pointed out that even if the statute has been designed to create offenses disconnected from the smuggling process, Congress might not have intended to extend the penalty for smuggling to such unconnected offenses. Refusing "to undertake extension of the penalty provision blindfold, without knowing in advance to what acts the penalties may be applied," the Court concluded:

"With both of the parties we agree that Congress meant to make criminal and to punish acts of concealing or harboring. But we do not know, we can only guess with too large a degree of uncertainty, which one of the several possible constructions Congress thought to apply. The uncertainty extends not only to the inconsistent penalties said to satisfy the section, either grammatically or substantively if not grammatically. It also includes within varying ranges at least possible, and we think substantial, doubt over the section's reach to bring in very different acts which conceivably might be held to be concealing or harboring. The latter ambiguity affects the former and their sum makes a task for us which at best could be only guesswork.

"This is a task outside the bounds of judicial interpretation. It is better for Congress, and more in accord with its function, to revise the statute than for us to guess at the revision it would make." 333 U.S. at 495, 68 S.Ct. at 640.

Faced with its own legislative oversight, Congress in 1952 sought to remedy the deficiencies noted in *Evans* by adopting Public Law 283, Ch. 108, 82d Cong., 2d Sess. (66 Stat. 26) entitled "An act to assist in preventing aliens from entering or remaining in the United States illegally." Later the same year Public Law 283 was incorporated as § 274 in the Immigration and Nationality Act of 1952 (66 Stat. 228), which presently continues in effect as Title 8 U.S.C. § 1324. Although Congress did not define the term "harbor" as used in the newly enacted section, it did again state that the purpose of the Act was "to strengthen the law generally in preventing aliens from entering *or remaining* in the United States illegally" (emphasis added). See H.Rep.No.1377, 82d Cong., 2d Sess. In debates with respect to the necessity of providing that the statutory prohibition would apply only to those who "wilfully and knowingly" conceal or harbor illegal aliens members of Congress appear to have assumed that one providing shelter with knowledge of the alien's illegal presence would violate the Act, and there was no suggestion that only conduct forming part of the smuggling process should be proscribed.[3]

At least two provisions in the statute as finally enacted are inconsistent with an intent to limit the prohibition to conduct connected with the smuggling of the alien into the United States. The first is a proviso in § 1324(a)(2) to the effect that in order to be guilty of knowingly transporting an illegal alien the person charged must "have reasonable grounds to believe that [the alien's] entry into the United States occurred less than three years prior thereto." Transportation at a point in time so long after the illegal entry would not normally be in furtherance of the smuggling process, which would long since have been completed. Secondly, Congress expressly provided that "for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." Since such employment would not normally be related to the smuggling process this exemption would, under Lopez's construction, be unnecessary.

Although our task would have been lightened if Congress had expressly defined the word "harbor," we are per-

---

3. Appellant relies on *Susnjar* v. *United States*, 27 F.2d 223 (6th Cir. 1928), holding that "harbor" refers to the *clandestine* sheltering of improperly admitted aliens. This case was of course decided without benefit of the history of the 1952 legislation which created the present § 1324. Moreover, the Court in *United States* v. *Evans, supra,* failed to adopt the *Susnjar* reading of "harbor," but instead left the term's meaning unresolved.

suaded by the language and background of the revision of the statute that the term was intended to encompass conduct tending substantially to facilitate an alien's "remaining in the United States illegally," provided, of course, the person charged has knowledge of the alien's unlawful status.

■ Lopez's conduct as evidence at trial clearly falls within this construction of § 1324(a)(3). The substantial number of illegal aliens sheltered by him, the entry of some from El Salvador with the addresses of his houses in hand, their travel directly to these houses after their illegal entry, his assistance to them in obtaining employment for them and transporting them to and from their jobs, his arrangement of sham marriage ceremonies to United States citizens for the purpose of enabling the aliens to claim citizenship, and his assistance in preparation of their applications for citizenship are circumstances which, taken together, warrant the inference that Lopez was engaged in providing shelter and other services in order to facilitate the continued unlawful presence of the aliens in the United States, which amounts to harboring within the meaning of the statute. Indeed such a large-scale operation would appear to establish a sufficient link with the aliens' illegal entry even to satisfy the stricter interpretation of § 1324 advanced by Lopez. Although a criminal statute must not be construed with liberality, it also should "not be narrowed by construction so as to fail to give full effect to its plain terms as made manifest by its text and its context." *Lamar* v. *United States*, 241 U.S. 103, 112, 36 S.Ct. 535, 538, 60 L.Ed. 912 (1916). We are satisfied that appellant's conduct is clearly encompassed within the meaning of § 1324 and that the construction urged by him would have the effect of failing to implement its language and purpose.

■ Appellant next argues on the authority of *Bouie* v. *City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), that, even though the district court's construction of the term "harbor" as used in § 1324(a)(3) might be applied prospectively, its application to his conduct amounted to a denial of due process for the reason that without fair notice it expanded the narrow and precise meaning that had been given to that word. We disagree. In *Bouie* the defendants, who had entered a department store restaurant without notice that it was reserved for whites and had remained there after being asked to leave, were convicted of violating a state "unlawful entry statute" as the result of a wholly unexpected judicial expansion or enlargement of its term "entry" to cover the act of *remaining* on premises after receiving notice to move, which appeared to be at variance with the statute's plain language and post-dated the defendant's conduct. The Supreme Court reversed on the ground that the failure to give fair notice of the expanded interpretation was so patently unfair as to constitute a denial of due process, comparable to the enactment of an "ex post facto" law in violation of Art. I, § 10 of the Constitution. No such lack of notice or unfairness exists in the present case. Although "harbor" has been defined to have several meanings, including "to receive clandestinely and conceal," its primary meaning is "to give shelter or refuge to," see Webster's Third International Dictionary, 1031; Black's Law Dictionary, Revised Fourth Edition, 847. At the time of the conduct forming the basis of the charges against Lopez it was readily apparent, as the Supreme Court had noted in *Evans*, that the term "harbor" might reasonably be construed to encompass the providing of shelter to illegal aliens, unconnected with the smuggling of them into the United States. Furthermore, Lopez's conduct could reasonably have been found from all of the circumstances to have been designed to facilitate the aliens' illegal entry. Lopez, therefore, had fair warning that his conduct might be held to violate § 1324, even if that statute were construed along the lines now advocated by him.

■ Finally appellant argues that § 1324 violates the Equal Protection and

442

Due Process Clauses of the Constitution because it excludes employment of illegal aliens from "harboring" without granting a similar exemption to providing shelter. The contention is meritless. Assuming that the Equal Protection Clause applies to this federal statute, which is doubtful, see *Bolling* v. *Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), it is not difficult to find a rational basis for the distinction. As the trial judge noted, an employer of numerous persons may well have a lesser capacity to ascertain their alienage status than does a landlord to determine that of his tenants.

The judgment is affirmed.