11-5165-cr
United States v. Vargas-Cordon

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2012

(Argued: December 13, 2012          Decided: August 12, 2013)

No. 11-5165-cr

———————————————————

UNITED STATES,
*Appellee,*

-v.-

MIGUEL ANGEL VARGAS-CORDON,
*Defendant-Appellant.*

———————————————————

Before:        POOLER, LEVAL, and LIVINGSTON, *Circuit Judges.*

Defendant-Appellant Miguel Angel Vargas-Cordon ("Vargas-Cordon") appeals from a judgment of conviction entered by the United States District Court for the Eastern District of New York (Glasser, *J.*), for one count of transporting a minor for illegal sexual purposes in violation of 18 U.S.C. § 2423(a), one count of transporting an unlawfully present alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and one count of harboring an unlawfully present alien in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Vargas-Cordon argues on appeal that there was insufficient evidence to convict him of transporting a minor for illegal sexual purposes, that the district court's *Allen* charge, *see Allen v. United States*, 164 U.S. 492 (1896), was unduly coercive, that the district court erred in its instruction of what constitutes "harboring" under 8 U.S.C. § 1324(a)(1)(A)(iii), and that the district court violated his due process rights by limiting cross-examination of the victim at trial. We conclude that Vargas-Cordon's claims are without merit. We accordingly AFFIRM the judgment of the district court.

Amy Busa, Soumya Dayanada, *on behalf of* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., *for Appellee.*

Thomas H. Nooter, Freeman Nooter & Ginsberg, New York, N.Y., *for Defendant-Appellant.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Defendant-Appellant Miguel Angel Vargas-Cordon ("Vargas-Cordon") appeals from a judgment of the United States District Court for the Eastern District of New York (Glasser, *J.*), entered November 29, 2011, convicting him after a jury trial of one count of transporting a minor for illegal sexual purposes in violation of 18 U.S.C. § 2423(a), one count of transporting an unlawfully present alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and one count of harboring an unlawfully present alien in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Vargas-Cordon challenges his convictions on four grounds: (1) that there was insufficient evidence to support his conviction under 18 U.S.C. § 2423(a); (2) that a supplemental jury charge, which quoted from the Supreme Court's decision in *Allen v. United States*, 164 U.S. 492 (1896), was unduly coercive; (3) that the district court incorrectly instructed the jury on the meaning of "harbors" under 8 U.S.C. § 1324(a)(1)(A)(iii); and (4) that the district court impermissibly limited his cross-examination at trial of the victim. For the reasons stated below, we

conclude that his arguments lack merit. Accordingly, we affirm the judgment of the district court.

**BACKGROUND**

## I. The Offense Conduct

Vargas-Cordon is a thirty-seven-year-old citizen of Guatemala who resides in the United States. In 2008, while visiting family in Guatemala, Vargas-Cordon began a sexual relationship with his then fifteen-year-old niece, referred to at trial as "Jaire" or "Jane Doe." Before Vargas-Cordon returned to the United States in April 2009, Jaire, who had a troubled home life, asked if she could accompany him. Though Vargas-Cordon initially refused, returning alone, he eventually made arrangements with a smuggler, or "coyote," to bring Jaire into the United States, paying $6000 for her transport. Supplied with a fake passport, Jaire left Guatemala a few months later for Vargas-Cordon's residence in Lakewood, New Jersey.

Jaire did not immediately reach her destination. Customs and Border Protection apprehended her at the California-Mexico border on August 28, 2009. Because Jaire stated that she did not have any family in Guatemala to whom she could return, federal authorities transferred her to an Office of Refugee

3

Resettlement ("ORR") facility in California.[1]  In December 2009, ORR relocated Jaire to a foster home in Crewe, Virginia, a small town southwest of Richmond.  Throughout all this time, Jaire remained in frequent telephone contact with Vargas-Cordon.  (Indeed, telephone records admitted at trial reflected a total of 189 calls.)  According to Jaire's foster mother, Jaire appeared "disappointed" upon arrival in Virginia that she had not been transferred to her uncle's care.

Jaire asked Vargas-Cordon to come down to Virginia and take her back with him to New Jersey.  Vargas-Cordon initially refused, explaining to Jaire that he would "get into problems . . . with the police."  He soon changed his mind, however, and on December 19, 2009, Vargas-Cordon and a coworker, Tom Grande ("Grande"), made the six-hour drive from Lakewood to Jaire's foster home in Crewe.  Jaire attempted to meet them the following morning, but was intercepted by her foster mother.  Vargas-Cordon called the foster mother later in the day and offered to take Jaire, to which the foster mother responded that he was not permitted to do so.  Jaire successfully snuck out of her foster home

---

[1] ORR, located within the Department of Health and Human Services, is responsible for the care of unaccompanied minors who enter or attempt to enter the United States. *See* 6 U.S.C. § 279.  Minors in ORR will typically first be placed into an ORR-run facility.  They may later be transferred into foster care, often arranged through a non-profit organization. Any removal proceedings against the minor remain pending while he or she is in ORR custody. *See* Olga Bryne & Elise Miller, Ctr. on Immigration & Justice, The Flow of Unaccompanied Children Through the Immigration System: A Resource for Practitioners, Policy Makers, and Researchers, (2012), *available at* http://www.vera.org/sites/default/files/resources/downloads/ the-flow-of-unaccompanied-children-through-the-immigration-system.pdf.

that evening, and met with Vargas-Cordon and Grande. The three then drove back to New Jersey.

After returning to New Jersey, Vargas-Cordon had Jaire stay with him in the home he shared with Grande, several other male construction workers, and one adult woman. Vargas-Cordon and Jaire shared a room together and had sex while in New Jersey. Vargas-Cordon did not enroll Jaire in school. Jaire soon began accompanying Vargas-Cordon and Grande to a home in Brooklyn where the two men had a job renovating a basement. Vargas-Cordon and Grande obtained the owner's permission to stay in the home while renovating it, in order to avoid daily travel between New York and New Jersey. Jaire thereafter stayed in Brooklyn with Vargas-Cordon, as well as Grande, returning with them to New Jersey on the weekends.[2]

While in Brooklyn, Grande saw Jaire and Vargas-Cordon enter various rooms and heard them having sex. The couple shared a bedroom, according to Grande, and he saw them kiss and shower together. Grande also witnessed Jaire and Vargas-Cordon purchase a pregnancy test and heard Vargas-Cordon discuss a potential pregnancy. Alarmed by the relationship, Grande contacted the organization that ran Jaire's foster care program, which in turn contacted

_____

[2] Vargas-Cordon told the home's owner that he wanted to keep Jaire with him while he was working in New York because he did not trust anyone who lived in the New Jersey house.

the authorities. On January 21, 2010, an agent from the Department of Homeland Security ("DHS") entered the Brooklyn home and found Jaire in one of the bedrooms. Vargas-Cordon was arrested and, in subsequent questioning, admitted that he had sex with Jaire two days prior.

**II. Procedural History**

A grand jury indicted Vargas-Cordon on three counts. Count One alleged that Vargas-Cordon had transported a minor for illegal sexual activity in violation of 18 U.S.C. § 2423(a).[3] Specifically, the count alleged that Vargas-Cordon transported Jaire from Guatemala to New York, in interstate and foreign commerce, with intent to commit both rape in the third degree and endangering the welfare of a child, in respective violation of New York Penal Law §§ 130.25(2)[4] and 260.10(1).[5] Count Two alleged that Vargas-Cordon

---

[3] 18 U.S.C. § 2423(a) provides that:

> A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

[4] New York Penal Law § 130.25(2) provides:

> A person is guilty of rape in the third degree when:
> . . . .
> 2. Being twenty-one years old or more, he or she engages in sexual

6

knowingly and intentionally transported an unlawfully present alien within the United States in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(1)(B)(ii).  Count Three alleged that Vargas-Cordon concealed and harbored an unlawfully present alien in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(B)(ii).[6]

intercourse with another person less than seventeen years old . . . .

[5] New York Penal Law § 260.10 provides:

A person is guilty of endangering the welfare of a child when:
. . . .
1.  He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving substantial risk of danger to his or her life or health . . . .

[6] 8 U.S.C. § 1324(a)(1)(A) provides in relevant part:

Any person who—
. . . .
(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;
. . . .
shall be punished as provided in subparagraph (B).

Vargas-Cordon pled not guilty to all three counts.

Trial commenced on March 21, 2011. The prosecution rested its case on March 22, and Vargas-Cordon moved for a judgment of acquittal, which the district court denied. At the ensuing charge conference, Vargas-Cordon raised objections to the proposed jury charge concerning, *inter alia*, Count Three. With respect to that count—for harboring an unlawfully present alien—defense counsel objected to the instruction that Vargas-Cordon could "harbor" an alien simply by providing her with shelter "in reckless disregard of her status" without requiring proof that he acted to conceal her from authorities. The district court overruled the objection, noting that any act that "facilitate[es] the person to remain alive by remaining where she is" constitutes "harboring" under the statute.

The district court charged the jury the following day. With respect to Count Three, the district court modified the instruction as discussed at

Section 1324(a)(1)(B) provides in relevant part that:

> A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—
> . . . .
> (ii) in the case of a violation of subparagraph (A)(ii) [or] (iii) . . . be fined under title 18, imprisoned not more than 5 years, or both
> . . . .

8

conference, adding that, to find Vargas-Cordon guilty of harboring, the jury must find that he intended to substantially facilitate Jaire remaining in the country illegally:

> With respect to the third element, the Government has to prove that the defendant harbored or concealed or shielded from detection [Jaire] who entered[,] who came or remained in the United States illegally.
> The statute prohibits this conduct which tends to directly substantially facilitate an alien remaining in the United States illegally. "Harboring" simply means to shelter, to afford shelter to. "Shield from detection" means to act in a way that prevents the authorities from learning of the fact that the alien is in the United States illegally. You don't have to find that the defendant acted secretly, that harboring the alien was done.
> To find based upon the evidence in this case that the Government proved that *the defendant harbored, afforded shelter to, [Jaire] in a way intended to substantially facilit[ate] her remaining here illegally*[,] that element has been . . . satisfied.

Trial Tr. at 449–50 (emphasis added).

After one hour of deliberation, the jury submitted a note stating, "[w]e, the jurors, disagree on Count One without hopes of a unanimous decision." Over defense counsel's objection, the district court summoned the jury and read what it described as a "modified *Allen* charge":

> I'm going to suggest that you continue your deliberations. You have, I think, been deliberating for just about an hour. It's normal for jurors to have differences of opinion initially, that's quite common.

9

But after some extended discussion, jurors frequently find that a point of view which they originally entertained and they believe to represent the fair, considered judgment may change after some extended discussion and exchange of views.

I want to emphasize, however, that a juror mustn't vote for any verdict if after a full and complete discussion, the juror feels quite strongly about his or her view.

But I should tell you that if you fail to agree upon a verdict in a case which is important to the Government as it is important to the defendant. It leaves one count completely open, the possibility it may have to be tried again, no reason to believe that the case will be tried any better or more exhaustively at a future time and tried to a jury more intelligent or more conscientious than you.

Many, many years ago, the Supreme Court of the United States had occasion to address a problem which arises when, as in this case, after very brief deliberation, you've only been deliberating for an hour, the jury returns a note and says it disagreed.

Let me read to you what the Supreme Court of the United States had [to] say in this regard:

"Although the verdict must be the verdict of each individual juror, they should listen with a disposition to be convinced of each other's argument. If the much larger number is more convinced [then] a dissenting juror should consider whether his or her doubt was a reasonable one which made no impression on the minds of the other jurors equally honest and equally intelligent as herself or himself.

But if, on the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might reasonably doubt the correctness of a judgment which was not considered by the majority."

What the Supreme Court is saying is that jurors should conscientiously discuss the case among themselves, deliberate with a predisposition to listen to each other with an open mind, but in no event should

10

you surrender an honest conviction which you have
about the case one way or the other and so I'll ask you
to continue your deliberation.

Trial Tr. at 463–65.

The next day, the jury sent another note, asking: (1) "If only one of the counts cannot be decided does only this issue get ever retried or the entire case, meaning all three counts?" and (2) "What is the maximum amount of time given to jurors to deliberate?" The district court informed the jury that there is no maximum amount of time afforded for deliberations, and that should they choose to return a partial verdict, that partial verdict would be final. The district court reminded the jurors that it is their "duty to discuss the case for the purpose of reaching a verdict, if you can do so conscientiously. Each of you must decide the case for yourself, but do so only after considering all the evidence, listening to the views of your fellow jurors, discussing it fully." The district court warned the jury not to "surrender an honest conviction as to the weight and effect of the evidence simply to arrive at a verdict."

The jury deliberated for four hours after receiving the first supplemental charge (for a total of five hours of deliberation). The jury returned a verdict of guilty on all three counts on March 24.

Vargas-Cordon moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c). Vargas-Cordon made three arguments relevant here:

11

(1) as to Count One, that there was insufficient evidence to convict him of transporting a minor with intent that an illegal sexual act take place because there was no direct evidence that he had this intent when transporting Jaire;[7] (2) that his conviction for "harboring" an unlawfully present alien as charged in Count Three was not supported by the evidence because "harboring" should not mean the simple provision of shelter, and there was no proof that he knew Jaire was in the United States illegally; and (3) that the district court's *Allen* charge was unduly coercive.

The district court denied Vargas-Cordon's motion. As to Count One, the court rejected Vargas-Cordon's argument that direct evidence of his intent was required, noting that "[i]t would surely be an immodest display of superfluous research to cite what must be a limitless number of cases for the principle that a jury's verdict may rest entirely on circumstantial evidence." The court similarly dismissed the argument that the evidence of Vargas-Cordon's knowledge that Jaire was in the country illegally was insufficient, observing that "knowingly, unlawfully, and intentionally remov[ing] [Jaire] from the custody of the foster home and transport[ing] her from Virginia to Brooklyn was plainly acting in furtherance of [Vargas-Cordon's] bringing and keeping her here in

---

[7] Vargas-Cordon also argued as to Count Two that there was insufficient evidence to convict him of transporting an unlawfully present alien because there was no evidence that he knew Jaire was in the country illegally at the time he took her from Virginia to New York. He does not pursue this argument on appeal.

12

violation of the law." Specifically as to Count Three, the court recited the jury instruction and asserted that "a more precisely fitting application of the statute to the facts that were established beyond any doubt, would be difficult to construct." The court finally concluded that its supplemental jury charge was not unduly coercive.

On November 29, 2011, the district court sentenced Vargas-Cordon to 120 months' imprisonment on Count One and 60 months' imprisonment each for Counts Two and Three, all sentences to run concurrently. Vargas-Cordon timely appealed.

## DISCUSSION

**I. Transportation of Minor with Intent to Engage in Criminal Sexual Activity**

Vargas-Cordon first contests the district court's determination that there was sufficient evidence to support his conviction under 18 U.S.C. § 2423(a). We review a district court's determination of a sufficiency challenge *de novo*. *United States v. Miller*, 626 F.3d 682, 690–91 (2d Cir. 2010). A defendant bringing such a challenge "bears a heavy burden." *Id.* We must "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility, and its assessment of the weight of the evidence." *United States v. Robinson*, 702 F.3d 22, 35 (2d Cir. 2012) (internal quotation marks

13

omitted). We will uphold the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

18 U.S.C. § 2423(a) provides:

> **(a) Transportation With Intent To Engage in Criminal Sexual Activity.**— A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

To secure a conviction under § 2423(a), the government thus must prove beyond a reasonable doubt that the defendant: (1) knowingly transported a minor across state lines and (2) with the intent that the minor engage in sexual activity for which some person could be criminally charged. The government need not prove, however, that the unlawful sexual activity actually took place: "§ 2423(a) is a crime of intent, and a conviction is entirely sustainable even if no underlying criminal sexual act ever occurs." *United States v. Broxmeyer*, 616 F.3d 120, 129 n.8 (2d Cir. 2010). What is required is "that the *mens rea* of intent coincide with the *actus reus* of crossing state lines." *Id.* at 129.

In addition, the contemplated unlawful sexual activity need not be the defendant's sole purpose for transporting a minor in interstate or foreign

14

commerce. Rather, it must only be a "dominant purpose" of the transportation. *See United States v. Miller*, 148 F.3d 207, 212–13 (2d Cir. 1998). This can include being one of multiple dominant purposes. As we have explained in connection with an analogous statute, a jury need only find "that illegal sexual activity . . . was one of the dominant motives for the interstate transportation of the minors, and not merely an incident of the transportation." *United States v. Sirois*, 87 F.3d 34, 39 (2d Cir. 1996) (affirming a conviction under 18 U.S.C. § 2251 for transporting a minor in interstate commerce with intent to produce child pornography).

Vargas-Cordon claims that there was insufficient evidence to prove either that he had the requisite intent to engage in unlawful sexual activity with Jaire when he transported her into New York or that unlawful sexual activity was a dominant purpose of his bringing Jaire into New York. We are not persuaded.

First, we agree with the district court that there was ample circumstantial evidence from which a reasonable factfinder could conclude that Vargas-Cordon intended to have sex with Jaire when he arranged to have her brought into the country and when he thereafter personally transported her from Virginia to New Jersey and then repeatedly into New York. As Jaire testified at trial, after initiating a sexual relationship with her in Guatemala, Vargas-Cordon arranged for Jaire to be smuggled into the United States, where their sexual relationship

15

immediately recommenced once the pair was reunited. Jaire testified that she had sexual relations with Vargas-Cordon in both New Jersey and in New York. Vargas-Cordon himself, in a post-arrest interview with Special Agent Michael Ortiz of DHS, admitted that he had intercourse with Jaire in Guatemala, that he had sexual relations with her again within a day of picking her up in Virginia, and that they had sexual relations on four occasions in Brooklyn, including two days prior to his arrest on January 21, 2010.

Vargas-Cordon argues that the government never presented evidence about precisely when the trips into New York occurred relative to the unlawful sexual activity, precluding a reasonable jury from finding that a dominant motive for these trips was to engage in unlawful sexual activity.[8] We disagree. The record is replete with evidence from which a reasonable jury could infer that sexual access to Jaire was a dominant purpose of Vargas-Cordon's repeated transport of her from his New Jersey home into Brooklyn. Vargas-Cordon, after paying a large sum to smuggle Jaire into the country, spirited her from her Virginia foster home even though he acknowledged that doing so would "get

_____

[8] Vargas-Cordon argues that only the trips from New Jersey to Brooklyn "have any nexus to the *New York* offenses charged in the indictment," and so only these incidents of interstate and foreign transportation may be considered in determining whether the evidence of his intent in transporting Jaire was sufficient to support conviction under § 2423(a). Appellant's Br. at 26. We need not address this argument, however, inasmuch as we conclude, for the reasons stated in the text, that the evidence was more than sufficient for a reasonable jury to conclude that Vargas-Cordon had the requisite unlawful intent in transporting Jaire into New York.

16

[him] into trouble." The evidence, moreover, including the testimony of Jaire and Grande, as well as Vargas-Cordon's admissions to Agent Ortiz, demonstrates that the couple was engaged in an ongoing sexual relationship from the day Vargas-Cordon picked up his niece in Virginia until he was arrested in New York just over a month later. Vargas-Cordon asserts that "the overwhelming purpose" of his travel into New York during this period "was that [he] could work at his place of employment" in Brooklyn. Appellant's Br. at 27. Even assuming this is true, however, it is irrelevant. Section 2423(a) is concerned not with why a defendant travels, but rather with the question why he transports a minor. A reasonable jury had ample basis here to conclude that a predominant reason – if not *the* dominant reason – for Jaire's repeated transport to New York was to facilitate the couple's ongoing sexual relations. We accordingly affirm Vargas-Cordon's conviction for transporting a minor in interstate commerce with intent to commit unlawful sexual activity in violation of 18 U.S.C. § 2423(a).

## II. *Allen* Charge

Vargas-Cordon next contests the district court's supplemental charge to the jury upon receipt of its first note, which the court described as a "modified *Allen* charge." "It has long been established that when a trial court receives notice that the jury is deadlocked it may give a charge, commonly referred to as

17

an '*Allen*' charge, that urges the jurors to continue deliberations in order to reach a verdict." *Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir. 1999). We review a district court's decision to give an *Allen* charge for abuse of discretion. *United States v. Crispo*, 306 F.3d 71, 77 (2d Cir. 2002).

Whether an *Allen* charge is appropriate given the circumstances of a particular case "hinges on whether it tends to coerce undecided jurors into reaching a verdict"—that is, whether the charge encourages jurors "to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." *United States v. Melendez*, 60 F.3d 41, 51 (2d Cir. 1995), *vacated on other grounds by Colon v. United States*, 516 U.S. 1105 (1996). We evaluate a charge's coerciveness "in its context and under all the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)). Our case law has accordingly considered a number of different factors when determining a charge's coercive effect. While some factors may be more important than others, none is, by itself, dispositive. For example, although we have stressed the importance of reminding jurors in an *Allen* charge not to abandon their conscientiously held views, *see Smalls*, 191 F.3d at 279, we have also upheld instructions that lacked such a warning, *see Spears v. Greiner*, 459 F.3d 200, 206 (2d Cir. 2006).

Under this standard, the most salient feature of the charge given in Vargas-Cordon's trial is its suggestion, quoting from *Allen* itself, that minority jurors consider the correctness of their view in light of the majority's position. Although the district court described its instruction as a "modified *Allen* charge," the instruction in fact contained the defining feature of a "traditional" *Allen* charge: the request that minority jurors—but not majority jurors—reconsider their views.[9] *See Spears*, 459 F.3d at 204 n.4. We have previously recognized the "potential coercive effect on jurors in the minority" of the traditional charge, have noted the modern tendency to use a modified charge that does not contrast the majority and minority positions, and have strongly suggested that the traditional charge should be used sparingly, and with caution. *Id.* at 204–05 n.4 (quoting *United States v. Flannery*, 451 F.2d 880, 883 (1st Cir. 1971)).

Still, precedent forecloses the conclusion that a traditional *Allen* charge is automatically coercive. The Supreme Court has reaffirmed the "continuing validity" of its observations in *Allen* regarding minority jurors and has noted that supplemental charges are to be reviewed in context and considering all the relevant circumstances. *Lowenfield*, 484 U.S. at 237–38. We ourselves,

---

[9] The focus on minority jurors makes an *Allen* charge "traditional" because the exact charge approved in *Allen* did the same. *See Allen*, 164 U.S. at 501–02. However, "[i]n more recent times, courts have tended to use 'modified' *Allen* charges that do not contrast the majority and minority positions." *Spears*, 459 F.3d at 204–05 n.4.

19

moreover, have declined to "take exception to the district court's quoting directly from *Allen v. United States*," and have "never held that the trial court must specifically inform the jury that the majority must consider the arguments and the opinions of those in the minority," even when *Allen*'s language is employed. *Melendez*, 60 F.3d at 52. Indeed, perhaps most importantly, we have previously upheld the use of traditional *Allen* charges nearly identical to the one used in this case. *See United States v. Hynes*, 424 F.2d 754, 757 n.2 (2d Cir. 1970).

We therefore must consider the other circumstances surrounding the district court's instruction. These circumstances, on balance, do not indicate an unacceptable risk of coercion. First, the district court repeatedly warned the jurors not to surrender their conscientiously held beliefs, which is an instruction we have previously held to mitigate greatly a charge's potential coercive effect. *See United States v. Henry*, 325 F.3d 93, 107 (2d Cir. 2003). Indeed, immediately after quoting *Allen*'s language on the subject of minority jurors, the district court specifically noted that:

> What the Supreme Court is saying is that jurors should conscientiously discuss the case among themselves, deliberate with a predisposition to listen to each other with an open mind, but in no event should you surrender an honest conviction which you have about the case one way or the other . . . .

Trial Tr. at 465. The jury deliberated for some four hours after receiving this instruction—four times as long as it deliberated before receiving it. Such lengthy post-instruction discussion "strongly indicates" a lack of coercion. *Spears*, 459 F.3d at 207 (quoting *United States v. Fermin*, 32 F.3d 674, 680 (2d Cir. 1994)).

The other factors cited by Vargas-Cordon do not alter our conclusion. While Vargas-Cordon argues that the emotionally charged nature of his alleged conduct compounded any pressure felt by jurors to convict, we do not think his offenses are any more sensational than those in previous cases where the use of a traditional *Allen* charge has been upheld. *See, e.g., Allen*, 164 U.S. at 501 (murder); *Crispo*, 306 F.3d at 75 (threatened kidnaping of two-year-old child). Similarly, both the given instruction's failure to remind jurors that the government bears the ultimate burden of proof and Vargas-Cordon's objection to the instruction after it was given, while relevant, are not enough to overcome the circumstances suggesting an absence of coercion.

Vargas-Cordon also objects to the giving of the *Allen* charge after only one hour of jury deliberation. We have previously held, however, that "[n]o fixed period of time must necessarily elapse before the charge may properly be given." *United States v. Robinson*, 560 F.2d 507, 517 (2d Cir. 1977) (en banc); *see also Hynes*, 424 F.2d at 757–58. The district court did not abuse its discretion in

deciding to give the charge when it did.  Importantly, the district court did not deliver its instruction *sua sponte,* but only after the jurors reported that they were "without hopes of a unanimous decision."  This report, moreover, although early in the jury's deliberations, was in the context of a trial that was not exceptionally long and involved neither a large number of separate counts, nor particularly complex factual issues.

Although we affirm its use in this case, we reiterate that a traditional *Allen* charge is a powerful tool that should be deployed only with great caution. *See Spears*, 459 F.3d at 205 n.4.  While it remains within the district court's discretion, giving a traditional *Allen* charge heightens the risk that a juror will feel coerced.  The circumstances of this case strongly indicate a dearth of such coercion, and we find no abuse of discretion in the district court's instruction here.  But, as the Supreme Court suggested in *Lowenfield*, a defendant's claim that jurors have been coerced by the mere suggestion that they listen with deference to the arguments of others (it being, "[t]he very object of the jury system . . . to secure unanimity by a comparison of views") has considerably less force "where the charge given, in contrast to the so-called 'traditional *Allen* charge,' does not speak specifically to the minority jurors."  484 U.S. at 237–38.

### III.  "Harboring" aliens under 8 U.S.C. § 1324(a)(1)(A)(iii)

Vargas-Cordon next argues that the district court's jury instruction on Count Three—harboring an unlawfully present alien in violation of 8 U.S.C.

22

§ 1324(a)(1)(A)(iii)—was erroneous. We review a claim of error in jury instructions *de novo*, reviewing the charge as a whole "to see if the entire charge delivered a correct interpretation of the law." *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (internal quotation marks omitted). We will reverse, however, only when the error was prejudicial. *Id.*

Section 1324(a)(1)(A)(iii) establishes criminal penalties for any person who:

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

8 U.S.C. § 1324(a)(1)(A)(iii). This statute originates from the Immigration Act of 1907, which criminalized the smuggling and transport of aliens into the United States. Pub. L. No. 59-96, 34 Stat. 898, 900–01 (repealed). Congress added prohibitions of concealing and harboring aliens ten years later. *See* Immigration Act of February 5, 1917, Pub. L. No. 64-301, 39 Stat. 874, 880 (repealed). Thirty years after that, the Supreme Court ruled in *United States v. Evans* that the statute did not provide any sort of penalty for its prohibition of concealing and harboring aliens. 333 U.S. 483, 495 (1948). Congress responded by adding an explicit penalty for any individual who "willfully or knowingly conceals, harbors, or shields from detection" an unlawfully present alien.

23

Immigration and Nationality Act of 1952, Pub. L. No. 82-414, Title IV, § 274(a), 66 Stat. 163, 228–29.  Congress did not define the term "harbors," however.  In 1986 Congress changed § 1324(a)(1)(A)(iii) to its current form, though keeping the phrase "conceals, harbors, or shields from detection."  *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, Title I, Part B, § 112(a), 100 Stat. 3359, 3381–82.

Vargas-Cordon contends that the district court instructed the jury that "harbors" under § 1324(a)(1)(A)(iii) "simply means to shelter, to afford shelter to," and that this was error.  He argues we should follow the Seventh Circuit's recent decision in *United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012), and conclude that to "harbor" under § 1324 requires some element of preventing detection by the authorities.  The government counters that, although "one sentence in the district court's charge defined 'harboring' simply as 'sheltering,'" the charge also instructed the jury that the government had to prove that Vargas-Cordon intended to substantially facilitate Jaire remaining in the country illegally. Appellee's Br. at 32.  According to the government, the totality of the district court's instruction was therefore consistent with Second Circuit precedent.

We note first that there is no precedent binding us to a particular interpretation of "harbors" under § 1324(a)(1)(A)(iii).  Our case law has been inconsistent in describing the minimum conduct necessary to sustain a

24

harboring conviction under § 1324. Our initial decisions on the topic, written in the 1940s, interpreted "harbor" to connote an element of evading detection. *See United States v. Smith*, 112 F.2d 83, 85 (2d Cir. 1940); *see also United States v. Mack*, 112 F.2d 290, 291 (2d Cir. 1940) (L. Hand, *J.*) ("[T]he statute is very plainly directed against those who abet evaders of the law against unlawful entry, as the collocation of 'conceal' and 'harbor' shows. Indeed, the word 'harbor' alone often connotes surreptitious concealment."). Yet, we stated in two opinions thirty years later that harboring under § 1324 "was intended to encompass conduct tending substantially to facilitate an alien's remaining in the United States illegally." *United States v. Lopez*, 521 F.2d 437, 441 (2d Cir. 1975) (internal quotation marks omitted); *see also United States v. Herrera*, 584 F.2d 1137, 1144 (2d Cir. 1978). While this definition could conceivably be consistent with *Smith* and *Mack*, in *Lopez* we concluded that the defendant had violated § 1324(a)(1)(A)(iii) simply because he had "engaged in providing shelter and other services in order to facilitate the continued unlawful presence" of certain aliens in the United States. 521 F.2d at 441. In *United States v. Kim*, 193 F.3d 567 (2d Cir. 1999), however, our most recent decision involving § 1324(a)(1)(A)(iii), we changed direction yet again. *Kim*, reverting to language consistent with our original discussions of the meaning of "harbors" as used in § 1324, affirms that harboring encompasses conduct which is intended to facilitate an alien's remaining in the United States illegally and "to prevent

25

government authorities from detecting [the alien's] unlawful presence." *Id*. at 574.

We note, moreover, that in our decisions arguably applying a broader conception of "harboring" that does not require that a defendant aim to assist an alien in remaining undetected by authorities, the defendants did more than merely provide shelter. In *Herrera*, the defendants had taken clear steps to prevent the detection of the unlawfully present aliens who worked in their brothel, including the installment of a video surveillance and alarm system designed to alert their employees whenever immigration officials approached the building. 584 F.2d at 1141–42. The defendant in *Lopez*, meanwhile, arranged sham marriages for some of the aliens to whom he rented homes. 521 F.2d at 439. In short, while some language from these opinions—now contradicted by our more recent statements in *Kim*—may suggest that mere sheltering is enough for a conviction under § 1324(a)(1)(A)(iii), there is no holding that compels us to so conclude.

Absent a binding interpretation of "harbor," we look to the statute's text. "As with any question of statutory interpretation," our first task is "to determine whether the language at issue has a plain and unambiguous meaning." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012). "[P]lain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Saks v.*

*Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003). We thus begin by "review[ing] the statutory text, considering the ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme." *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 155 (2d Cir. 2013) (internal quotation marks omitted).

We do not think the ordinary meaning of "harbors," at least with respect to whether it entails avoiding detection, is unambiguous. While "harbor" may sometimes be synonymous with "shelter," many of its most common uses—for example, "harboring a fugitive"—also connote concealment. Dictionaries, either from the early twentieth century or today, do not consistently define "harbor" as containing or lacking an element of concealment. *Compare, e.g.*, Black's Law Dictionary 784 (9th ed. 2004) (defining "harboring" as "[t]he act of affording lodging, shelter, or refuge to a person) *with* Black's Law Dictionary 561 (2d ed. 1910) (defining "to harbor" as "[t]o receive clandestinely and without lawful authority a person for the purpose of so concealing him that another having a right to the lawful custody of such person shall be deprived of the same"); *see also* Webster's Third New Int'l Dictionary 1031 (1961) (defining "harbor" as "(1) to give shelter or refuge to: to take in [and] (2) to receive clandestinely and conceal (a fugitive from justice)"). Given this lack of uniformity, we hesitate to derive a singular meaning of "harbor" either from its common use or from particular dictionary definitions.

The placement of "harbors" in 8 U.S.C § 1324(a)(1)(A)(iii), however, does indeed suggest that the term is intended to encompass an element of concealment. Specifically, "harbors" appears in subparagraph (A)(iii) as part of a list of three proscribed actions: "conceals, harbors, or shields from detection." The other two terms—"conceals" and "shields from detection"—both carry an obvious connotation of secrecy and hiding. The canon of *noscitur a sociis* would thus suggest that "harbors," as the third and only other term in subparagraph (A)(iii), also shares this connotation, which easily fits into its ordinary meaning. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps."). Indeed, this is the same reasoning we used over seventy years ago to first conclude that "harbors" in § 1324(a)(1)(A)(iii) contained an element of concealment. *See Mack*, 112 F.2d at 291.

The broader structure of § 1324(a) further supports reading "conceals, harbors, or shields from detection" as sharing a common "core of meaning" centered around evading detection. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1403 n.7 (2010). Subsection 1324(a)(1)(A) is divided into four subparts, each of which proscribes a particular type of action. The first reaches anyone who brings an alien into the United States outside of a specified entry point. 8 U.S.C. § 1324(a)(1)(A)(i). The second applies to anyone who "transports, or moves" an unlawfully present alien in furtherance of that alien's violation of the law. *Id.*

28

§ 1324(a)(1)(A)(ii). The fourth applies to anyone who "encourages or induces" an alien to enter the United States unlawfully. *Id.* § 1324(a)(1)(A)(iv). Each subpart thus focuses on a single kind of act, and those that use different terms to describe the act use near-synonyms with a clear overlap in meaning: "transports" and "moves" for § 1324(a)(1)(A)(ii), or "encourages" and "induces" for § 1324(a)(1)(A)(iv). We think it fair to infer from this structure that Congress did not intend the inclusion of "harbors" in § 1324(a)(1)(A)(iii) to make that subsection, and that subsection alone, simultaneously cover the two distinct acts of keeping from the authorities an alien's presence and simply offering the alien a place to stay.

We accordingly hold that our description of harboring in *Kim*—conduct which is intended to facilitate an alien's remaining in the United States illegally and to prevent detection by the authorities of the alien's unlawful presence—is the correct interpretation of that term as it is used in § 1324(a)(1)(A)(iii). 193 F.3d at 574. To "harbor" under § 1324, a defendant must engage in conduct that is intended both to substantially help an unlawfully present alien remain in the United States—such as by providing him with shelter, money, or other material comfort—and also is intended to help prevent the detection of the alien by the authorities. The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police, is thus not an offense under § 1324(a)(1)(A)(iii).

29

We therefore agree with Vargas-Cordon that if the district court had instructed the jury that "harboring" under § 1324(a)(1)(A)(iii) "simply means to shelter," it would have erred. We conclude, however, that the district court did not err because it properly instructed the jury on the elements of harboring. While the court stated that "'Harboring' simply means to shelter, to afford shelter to," the entire charge taken as a whole conveyed to the jury that simply providing shelter was insufficient to support a conviction under § 1324(a)(1)(A)(iii). Rather, the very next sentence properly instructed the jury that to find that Vargas-Cordon harbored Jaire, it must "find based on the evidence in this case that the Government proved that the defendant . . . afforded shelter to[] [Jaire] *in a way intended to substantially facilit[ate] her remaining here illegally."* J.A. at 95. Thus, the jury was properly apprised that it needed to find not just that Vargas-Cardon had afforded Jaire shelter, but also that he had done so with the intent to prevent her detection by the authorities.[10] Moreover, the evidence presented at trial was sufficient for a rational jury to convict Vargas-Cordon under this narrower definition of "harbors." The reason is simple: even if Vargas-Cordon's conduct lacked the hallmarks of active, classic

---

[10] While it would have preferable for the district court to explain that harboring requires acting with an intent to prevent an alien's detection, the instruction as a whole, including its requirement that there be intent to substantially facilitate an alien remaining in the United States illegally, "adequately communicated the essential ideas to the jury," and "adequately inform[ed] the jury of the law." *See United States v. Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010) (citations omitted).

concealment, it nevertheless was intended to make Jaire's detection by the authorities substantially more difficult. Vargas-Cordon helped Jaire escape from her foster home and then brought her to a new location in a different state unknown to either her foster care provider or the federal government. This undoubtedly diminished the government's ability to locate and apprehend Jaire.

This is true even if Vargas-Cordon did not actively hide Jaire from the outside world. Vargas-Cordon knew that he was not permitted to take Jaire out of foster care: he said as much to Jaire, Jaire's foster mother told him so, and his late-night rendezvous with Jaire in Virginia did not suggest anything to the contrary. The subsequent sheltering of Jaire, therefore, was done with the knowledge that Jaire was legally in the custody of another person, and that if she were detected by police or other authorities she would likely be returned to that person. Similarly, that Vargas-Cordon intended to live with Jaire even before she was apprehended by the government does not change things. By the time Jaire arrived in New Jersey, Vargas-Cordon's motivations were both to continue their relationship and to prevent authorities from returning her to government-arranged foster care.

Indeed, Vargas-Cordon's actions closely track the definition of "harboring" given by this Circuit in *Firpo v. United States*, 261 F. 850 (2d Cir. 1919). *Firpo* involved a precursor statute to 18 U.S.C. § 1831 that provided criminal penalties for "whoever shall harbor, conceal, protect, or assist" a military deserter. *Id.* at

31

851. We explained that "[t]o harbor, as used, means to lodge, to care for, after secreting the deserter." *Id.* at 853. This is, of course, precisely what Vargas-Cordon did: he secreted Jaire from her foster home, and then lodged and cared for her until she was found by the authorities. While *Firpo* may have involved a separate statute, its definition of "harboring" fits comfortably within *Kim*'s: one who secretes an alien, at least from a location known to the government, will almost always make detection of that alien more difficult.

Vargas-Cordon's actions also distinguish his case from *Costello*. There the defendant did little more than allow her boyfriend, who had previously been arrested and deported, to come and stay at her home. 666 F.3d at 1042. As the Seventh Circuit noted, the defendant was not trying to make her boyfriend's detection more difficult: her boyfriend had lived in the same town and at the same address with her before he was arrested and lived openly and conspicuously with her again upon his return. *Id.* at 1042–43, 1045. Vargas-Cordon, meanwhile, spirited Jaire out of her foster home and then provided her with shelter in a location unknown to any relevant authorities. In contrast to *Costello*, his sheltering of Jaire substantially and successfully worked to help prevent her return to government-arranged foster care.

## IV. Limitation of Cross-Examination of Jaire

Vargas-Cordon argues, finally, that the district court committed non-harmless error (indeed, that the court violated due process) by sustaining the

government's objections to two questions during Jaire's cross examination concerning what Jaire told Vargas-Cordon about whether she had permission to stay in the United States during the time she was in foster care. Specifically, the district court sustained objections as follows:

> [Defense]: Did you tell [your uncle] anything about what was happening with your case in immigration court?
> [Jaire]: No.
> [Defense]: Did you tell [your uncle] that you were trying to get papers in order to stay in the U.S.?
> [Jaire]: Yes.
> [Defense]: Did you have the help of an immigration lawyer?
> [Government]: Your Honor, I would object to this line of questioning.
> [The Court]: Objection is sustained.
> [Defense]: At the time you were living in Virginia, did you believe you had permission to stay in the United States?
> [Government]: Objection.
> [The Court]: Sustained.
> [Defense]: Did you tell your uncle you had permission to be in the United States?
> [Government]: Objection.
> [District Court]: Sustained.

Trial Tr. at 119–20. Vargas-Cordon claims that the court erred in preventing Jaire from answering the final two questions in this exchange. This error in turn kept him from establishing that he believed Jaire was no longer in immigration custody after her transfer to a foster home—a belief that, according to him, meant he lacked *mens rea* in connection with Count Two's charge that

he transported Jaire knowing or in reckless disregard of the fact that she had come to, entered, or remained in the United States in violation of law.[11]

We will grant a retrial for improper evidentiary rulings only where these rulings were "so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *United States v. Bell*, 584 F.3d 478, 486 (2d Cir. 2009) (quoting *Phillips v. Bowen*, 278 F.3d 103, 111 (2d Cir. 2002)).  Such is not the case here.  The first question at issue—whether Jaire personally believed that she had permission to stay in the United States—has no bearing on Vargas-Cordon's *mens rea* under § 1324(a)(1)(A)(ii).  Meanwhile, the second question—whether Jaire told Vargas-Cordon that she had permission to be in the United States—bears on Vargas-Cordon's *mens rea* only if Jaire told him she had (or lacked) such permission *before* he transported or harbored her.  Yet defense counsel – who made no offer of proof as to what Jaire would say – failed even to specify any sort of time frame for the question, so that even an affirmative response from Jaire would not necessarily have been relevant to Vargas-Cordon's culpability.  Finally, we are to consider an evidentiary ruling's

---

[11] While the district court's rulings could also be relevant to the *mens rea* element of Vargas-Cordon's conviction for harboring an unlawfully present alien under 8 U.S.C. § 1324(a)(1)(A)(iii), Vargas-Cordon does not make this argument on appeal. *See United States v. Colasuonno*, 697 F.3d 164, 171 n.2 (2d Cir. 2012) (arguments not made on appeal are waived).

potential prejudicial effect "in light of the record as a whole," *id.* (quoting *Phillips*, 278 F.3d at 111), and the record here provides scant evidence that Vargas-Cordon had reason to think Jaire could lawfully stay with him in New Jersey. In such circumstances, "we are hard-pressed to conclude that the unpermitted questions had damaging potential." *Jones v. Berry*, 880 F.2d 670, 675 (2d Cir. 1989). Accordingly, we decline to grant Vargas-Cordon a new trial on Count Two.

## CONCLUSION

We have considered Vargas-Cordon's remaining arguments and find them to be without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.