**UNITED STATES of America,**
**Appellee,**

**Salvatore Michael CARUANA,**
**Defendant-Appellant.**

**No. 80–1705.**

United States Court of Appeals,
First Circuit.

Argued May 5, 1981.

Decided June 29, 1981.

Judith H. Mizner, Boston, Mass., with whom Joseph S. Oteri, Martin G. Weinberg, Vincent Savarese, III, and Oteri & Weinberg, Boston, Mass., were on brief, for defendant-appellant.

Elliot D. Lobel, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES and BREYER, Circuit Judges, and WYZANSKI, Senior District Judge.[*]

PER CURIAM:

The defendant Caruana appeals from a judgment convicting him of violation of 18 U.S.C. § 111 in that he forcibly intimidated Montanari and Walsh, two FBI agents, while they were engaged in the performance of their official duties. The appeal is based on the failure of the district judge to grant defendant's motions at the close of the Government's case, at the close of all the evidence, and after the jury's verdict. The principal point raised in each motion was the alleged lack of sufficient evidence of defendant's specific intent.

We examine the evidence in the light most favorable to the Government, *United States v. Davis*, 623 F.2d 188 (1st Cir. 1980), *United States v. Indelicato*, 611 F.2d 376, 384 (1st Cir. 1979).

On September 14, 1979, FBI agents Walsh and Montanari went to the residence of Caruana in order to serve a grand jury subpoena. Attempting to serve the subpoena through the front door, they were directed to the back entrance. They went to the back porch, opened the gate, entered, and rang the bell at the back door. Moments later, one of Caruana's employees brought one of two Doberman Pinscher dogs out from a ground level dog pen and attempted to put the dog on the same back porch where the agents were located. The dog was straining to get freedom and it ap-

---

[*] Of the District of Massachusetts, sitting by designation.

peared that the person handling the dog was barely in control. Displaying his FBI credentials, Walsh asked where the person was bringing the animal. He responded that "[he] was told to bring the dog up." Walsh told him to bring the dog elsewhere while he conducted his business. The person complied. Soon thereafter, another of Caruana's employees brought on the porch a second Doberman Pinscher and the FBI agents told him to remove that dog. After several ringings of his back doorbell, Caruana answered, holding one Doberman Pinscher dog by either the collar or a leash. Another Doberman Pinscher was nearby.

When asked by Caruana the purpose of the agents' visit, Walsh said that they were there to serve him with a subpoena for his appearance before a Federal Grand Jury in San Antonio. Walsh began to fill out the return portion of the subpoena.

Caruana then opened the screen glass storm door to the porch and let the two Doberman dogs out onto the porch. The dogs darted out. He then shut the door and watched what happened.

With the dogs' entry onto the porch, Walsh became slightly nervous, he felt "fearful and apprehensive"; his hand now shaking, he continued to fill out the subpoena. Montanari "felt intimidated," and believed that Caruana had put the dogs onto the porch "to intimidate us."

Walsh then completed the return and started to hand the subpoena to Caruana. The defendant again opened the door, this time to accept service. He promptly closed the door, but then "stood right there." The agents proceeded to the gate of the porch.

The dogs were snarling, snapping and coming at the agents. One pinscher lunged at Walsh and bit him on the calf of his right leg. Walsh screamed, "Your dog just bit me. Call him off." Caruana refused, saying "I am not calling them off."

The dogs continued to harass the agents. One jumped up on top of Walsh and lunged at him with his paws and pushed him into the corner. The agents again asked that Caruana call the dogs off. Again refusing, Caruana replied, "I am not calling them off."

Caruana not only laughed during the entire incident, but looked as if he were enjoying himself. At no time did Caruana indicate he was incapable of calling the dogs off, nor did he make any offers of aid to assist the bitten agent.

Upon the basis of the foregoing evidence a jury could find beyond a reasonable doubt that it was the specific intent of Caruana to intimidate the two FBI agents while they were engaged in the performance of their official duties.

The act of the defendant in releasing the dogs caused, and was intended by him to cause, the FBI agents while in the performance of their duties to be intimidated. The FBI agents testified that the defendant's release of the dogs intimidated them while in the performance of their duties. And the circumstances show that Caruana performed the release with the purpose of effectuating such intimidation.

There is no force in the defendant's argument that the government failed to show that he knew that the dogs were dangerous or that it was the defendant's purpose in releasing the dogs to use that release to intimidate the FBI agents.

To be sure, by itself, the breed of the dogs was not a conclusive fact. But the breed of the dogs taken together with the place where they previously had been kept, and the fact that Caruana was holding one of the dogs by leash or by collar when he first appeared at the back door all strongly indicate that the dogs not merely presented a danger to the FBI agents, but were known by Caruana to present such danger. When Caruana opened the door it is an irresistible inference that he deliberately rather than accidentally let the dogs out. It is a more than reasonable inference that Caruana's purpose was to intimidate the agents. Indeed, we can think of no other reasonable inference for it would be most unlikely that at that time Caruana's purpose was merely to let the dogs exercise on the porch. Moreover, it is fair to infer what was Caruana's purpose at the moment

of releasing the dogs from his *immediately* subsequent conduct. Had he not had the purpose to intimidate the agents, it is most improbable that he would have laughed at them, refused to call off the dogs, and not offered help to the agents.

 The defendant contends that even if there was sufficient evidence to satisfy the statute and the indictment, nonetheless, the verdict should be set aside because the evidence fell short of satisfying the trial judge's charge. The main thrust of the charge was that to find the defendant guilty, the jury had to find that "the defendant wilfully released the dogs ... that the officers were thereby reasonably fearful of bodily harm ... [and] the defendant released the dogs with the specific intent and expectation that they would frighten the officers." (A. 288–289) However, at an early stage the judge had said:

> The indictment charges that the defendant acted forcibly and thus there must be an ability and a specific intent to inflict harm by the use of force.
>
> In order for you to find that the dogs were used as instruments of force or assault, you must find that the defendant had sufficient control over them so as to use them as instruments to effectuate a specific intent on his part to forcibly intimidate the officers and that the defendant specifically intended that the dogs respond to such control by command or signal. (A. 286–287)

Unlike the defendant, we do not read the last clause as a clear instruction that before the jury could find the defendant guilty they would have to find that it was the defendant's intention that he should control the dogs *after* he had opened the door to let them loose on the porch. The context seems to indicate that the instruction permitted the jury to find the defendant guilty if the defendant intended that when he opened the door, the dogs should construe that opening of the door as a command or signal that they should pass through the door on to the porch where defendant expected that their presence would intimidate the officers. The instruction did not re-

quire that the jury must find that the defendant intended that he should continue to control the dogs after they were on the porch.

There was ample evidence to satisfy the instruction as we construe it.

*Affirmed.*