UNITED STATES of America, Plaintiff,

v.

Vladimir FARKASH, Defendant.

No. 96–1289M.

United States District Court,
D. Colorado.

June 11, 1996.

Martha Paluch, Asst. U.S. Atty., Denver, CO, for U.S.

Griffith Kundahl, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BORCHERS, United States Magistrate Judge.

THIS MATTER came before the Court for trial on June 3, 1996. Defendant had waived his right to a trial by jury. The Court heard the testimony of the witnesses and argument of counsel. The matter was taken under advisement.

### I.

The Court finds from the evidence presented by both sides that the following are the facts of what occurred.[1] Defendant was originally from what is now the Czech Republic. Defendant came to the United States in 1970 and became a United States citizen in 1976. Defendant is by training a geophysi-

1. Defendant's motion for severance of the two counts in the information was granted. The Court heard evidence as to Count I separately from Count II. Each count has been examined solely on the evidence presented as to that count.

cist, but was unemployed at the time of the trial.

In the early 1980's, Defendant met Lauren Lincoln (Lauren). The two were married in 1982 and remained married until 1990. At some point after the decree of dissolution of marriage was entered, Defendant and Lauren resumed cohabitation in the home in Arvada that they had purchased while married. This arrangement continued until October, 1995 when Lauren moved out and then moved in with her boyfriend. The testimony from both Defendant and Lauren indicated that the two of them continued to have some contact after the October, 1995 breakup.

On March 29, 1996, Defendant came to the National Park Service (NPS) building located at 12795 West Alameda Parkway, Lakewood, Colorado. Defendant approached the security guard, Michael Adams, who was located in the foyer of the building. Defendant was asked for identification and presented what Mr. Adams described as a government identification card issued by the United States Geological Survey (USGS). Because Defendant produced what appeared to be a government ID card, he was allowed to enter the building.[2]

The testimony indicated that Defendant went to Lauren's desk, which was located in the NPS building. Lauren returned from a break and was surprised to see Defendant. The two then left the building and exchanged some items in the parking lot of the NPS building. Defendant then entered the truck owned by Lauren's boyfriend and began going through the vehicle looking for something. Lauren and Defendant then parted, and Defendant left the vicinity of the building.

On April 1, 1996, Lauren and her boyfriend, also a NPS employee, approached Captain Brian Reilly of the NPS Park Police. Lauren advised Captain Reilly that she was concerned that Defendant had improperly entered the NPS building on March 29, 1996 and that she did not want to have further direct contact with him. She indicated that she felt intimidated and harassed by Defendant.

Captain Reilly checked the visitors' book and determined that Defendant had not signed in on March 29, 1996. Captain Reilly was advised by the security guard that Defendant had presented what appeared to be a USGS identification card. Upon further investigation, Captain Reilly determined that Plaintiff was not a USGS employee and had no right to have any card purporting to be an identification card from that agency.

Based upon the complaint of Lauren and his own investigation, Captain Reilly issued a security bulletin. Security staff were advised that Defendant should not be allowed to enter the NPS building and that any government ID card should be seized from him. Copies of the security bulletin were distributed to all security posts and personnel.

On April 3, 1996, Defendant came to the NPS building. Defendant parked his vehicle in the parking lot. He exited the vehicle with his dog, Suki. This dog had been in the home when Lauren and Defendant were still together.

Defendant entered the NPS building with the dog and approached the security post. Alan Ayers was working as the security guard at that time. Mr. Ayers recognized Defendant from the security bulletin. He advised Defendant that he could not have the dog in the NPS building. Mr. Ayers told Defendant that he would have to leave with the dog, but he would try to contact Lauren for Defendant. At that point, Defendant exited the building and tied the dog outside the building. Defendant then returned into the building.

Mr. Ayers had contacted the Federal Protective Service (FPS) office asking for an officer to respond. When Defendant returned to the building, Mr. Ayers advised that Lauren was not answering her telephone. Defendant left the building and Mr. Ayers came outside, as he was concerned that Defendant was not going to leave the

---

2. Absent a government ID card, a visitor to the building must present a driver's license or other picture ID and sign a visitors' log-in book. Defendant did not sign the visitors' book on March 29, 1996.

area. After some delay and discussion, Mr. Ayers advised Defendant that he was not going to be allowed to enter the building. At approximately the same time, Defendant overheard a radio transmission from the FPS dispatcher to an officer concerning Defendant. Mr. Ayers was asked by Defendant concerning the radio transmission "was that me?" Mr. Ayers indicated that it was, and Defendant left the NPS building.

Rather than departing by his vehicle, Defendant untied the dog and started walking toward a local shopping center. Defendant testified that he planned to use the public telephones at that location to call Lauren. He had the dog on a leash.

Mr. Ayers remained outside the NPS building and kept sight of Defendant. Sergeant Danny Fero of the FPS arrived in his vehicle. He inquired of Mr. Ayers as to the location of the individual about whom Mr. Ayers had expressed some concern. Mr. Ayers pointed to Defendant.

Sergeant Fero then drove to a location near the shopping mall and exited his vehicle. Sergeant Fero called out to Defendant who turned around. Defendant told Sergeant Fero that "I was not there" when asked if he had been at the NPS building. Sergeant Fero asked Defendant for identification and Defendant refused to provide it. Defendant responded to the request of the FPS officer by saying that "I do not want to talk to you." He then indicated that "stay away or my dog will attack you."[3] Defendant refused to obey any commands of Sergeant Fero and started to turn away. Sergeant Fero reached out to grab the arm of Defendant. At that point, Defendant spun around and told his dog to bite the FPS officer.[4] Sergeant Fero then pulled Defendant toward him in order to protect himself from the dog. Defendant and Sergeant Fero then fell to the ground, and a scuffle ensued. The scuffle ended when two male citizens helped subdue Defendant.

Defendant was arrested and taken to Denver General Hospital, as he was complaining of injuries suffered in the scuffle. Defendant was charged initially with assault on an officer. The violation notice given to Defendant was superseded by the information filed by the prosecution.

The Court listened carefully to the testimony of all witnesses, but particularly closely to the testimony of Sergeant Fero and Defendant. The Court had the opportunity to observe demeanor during testimony. Sergeant Fero was genuinely scared as to his own safety as a result of incident. Sergeant Fero's testimony was believable. Defendant's testimony was not credible as to many aspects and reflected an apparent desire to put the best possible story before the Court.

## II.

Defendant was charged in Count II with a violation of 18 U.S.C. § 111(a) which reads, in part, as follows:

(a) Whoever—

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . .

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more then one year, or both. . . .

The prosecution has argued that the crime was committed prior to the actual scuffle. On the other hand, Defendant has raised a number of points as to why he does not believe that the case has been proven beyond a reasonable doubt.

The evidence presented indicated that Sergeant Fero was a member of the Federal Protective Service. This law enforcement agency exists pursuant to 40 U.S.C. § 318. Officers of the FPS are police officers. *United States v. Burton*, 888 F.2d 682 (10th

---

**3.** Defendant testified that he never made such a statement. He claimed to have made a statement in Czech to the dog. When defense counsel in direct examination asked witness Milos Linhart, a native of Prague, concerning the Czech phrase purportedly given to the dog, Mr. Linhart did not recognize it. The Court finds that no

such statement was made in Czech to the dog at that time.

**4.** Defendant's dog was a large Chesapeake Retriever.

Cir.1989); *Jarecki v. United States,* 590 F.2d 670 (7th Cir.), *cert. denied,* 444 U.S. 829, 100 S.Ct. 55, 62 L.Ed.2d 37 (1979).

■ Defendant argued at trial that Sergeant Fero's status as a police officer ceased when he left federal property.[5] Defendant points to no case that so holds, and this Court has found no such case. In the present matter, Sergeant Fero received a call from the security guard at the NPS building. He responded and was attempting to make contact with Defendant. Nothing presented at trial indicated that Sergeant Fero's actions were inappropriate in trying to contact Defendant. This Court finds that Sergeant Fero did not lose his status as a federal officer merely because his duties required him to follow Defendant onto private property.

The evidence indicated, and the Court so finds, that Defendant did threaten to have his dog attack Sergeant Fero. The prosecution argued at trial that the threat constituted the assault, and that battery need not be shown. *United States v. Calderon,* 655 F.2d 1037 (10th Cir.1981). The Court agrees and also finds that the threat impeded the actions of the officer, and any attempt to impede violates 18 U.S.C. § 111(a). In an analogous case, the First Circuit held that use of dogs to impede and intimidate agents of the Federal Bureau of Investigation violated § 111. *United States v. Caruana,* 652 F.2d 220 (1st Cir.1981).

In this case, the Court determines that Defendant did tell Sergeant Fero to leave him alone or the dog would attack him. The Court finds beyond a reasonable doubt that this action violated § 111(a). Defendant is guilty of this charge.

## III.

■ In Count I, Defendant was charged with a violation of 18 U.S.C. § 701. This statute reads as follows:

Whoever manufacturers, sells, or possesses any badge, identification card, or other insignia, of the design prescribed by the head of any department or agency of the United States for use by any officer or employee thereof, or any colorable imitation thereof, or photographs, prints, or in any other manner makes or executes any engraving, photograph, print, or impression in the likeness of any such badge, identification card, or other insignia, or any colorable imitation thereof, except as authorized under regulations made pursuant to law, shall be fined under this title or imprisoned not more than six months or both.

In this case, the prosecution alleges that Defendant used a false government identification card on March 29, 1996 and, therefore, violated § 701.

In *United States v. Goeltz,* 513 F.2d 193 (10th Cir.1985), the Tenth Circuit dealt with a case brought under § 701. The court held that § 701 "was intended to protect the public against the use of recognizable assertion of authority with intent to deceive." *Id.* at 197. In that case, defendants had photo reproductions of Internal Revenue Service warning of seizure letters that were to be used to disrupt IRS activities.

The only evidence presented to this Court concerning the identification card was the testimony of Michael Adams, the on-duty security guard. Mr. Adams testified that it looked like an official identification card when presented by Defendant. Mr. Adams was not specific about all information contained on the card, other than it indicated that Defendant was a USGS employee.

This Court has a doubt as to the sufficiency of the evidence presented as to this Count. Defendant is found not guilty of the charge brought under § 701.

IT IS HEREBY ORDERED that Defendant is found guilty of Count II, alleging a violation of 18 U.S.C. § 111(a), and not guilty as to Count I, alleging a violation of 18 U.S.C. § 701; and

---

**5.** Defendant argued that Sergeant Fero was in the status of a civilian, thus requiring any charge to be brought in a state court.

IT IS FURTHER ORDERED that Defendant is referred to the Probation Department for preparation of a presentence report.