United States v. Melhuish

# In the
# United States Court of Appeals
## for the Second Circuit

August Term, 2020
No. 19-485

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

CATHERINE MELHUISH,
*Defendant-Appellant.*[*]

Appeal from the United States District Court
for the Northern District of New York.
No. 8:18-cr-110 — Thomas J. McAvoy, *Judge*.

ARGUED: FEBRUARY 2, 2021
DECIDED: JULY 27, 2021

Before: WALKER, WESLEY, and NARDINI, *Circuit Judges*.

[*] We direct the Clerk of Court to amend the caption as set forth above.

Defendant-Appellant Catherine Melhuish appeals from a judgment of conviction entered on February 21, 2019, following a jury trial in the United States District Court for the Northern District of New York (Thomas J. McAvoy, *J.*). Melhuish argues that (1) the district court erred by providing a written response to a jury note without affording the parties an opportunity to offer input on the response; (2) the district court erred by orally instructing the jury to continue deliberations without sufficient cautions and guidance; and (3) she received ineffective assistance of counsel. As to the district court's written jury note response and oral instruction, we conclude that the district court erred in both respects but that neither error rose to the level of plain error. As to Melhuish's ineffective assistance of counsel claim, we first conclude that the crime of assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1) and (b) is a general intent crime, and therefore that counsel's performance was not deficient for failing to offer evidence showing a lack of specific intent. Nevertheless, we conclude that further fact-finding is necessary and that the district court must conduct a hearing regarding certain decisions of Melhuish's counsel, including the decision not to offer expert testimony regarding her mental health condition with respect to an insanity defense. We therefore **REMAND** for a hearing regarding Melhuish's ineffective assistance of counsel claim.

———————

BRUCE R. BRYAN, Syracuse, New York, *for Defendant-Appellant*

PAUL D. SILVER (Michael D. Gadarian, *on the brief*), Assistant United States Attorneys, *for* Antoinette T. Bacon, Acting United States Attorney for the Northern District of New York, Albany, New York, *for Appellee*

WILLIAM J. NARDINI, *Circuit Judge*:

This case involves a violent altercation between a United States Border Patrol Agent and a woman with a history of severe mental illness. Agent Rodney Caccavo encountered Defendant-Appellant Catherine Melhuish as she was walking barefoot and disheveled by the side of the road in the middle of the night. After Caccavo approached Melhuish to check her condition, Melhuish began speaking gibberish and spitting, and a physical struggle ensued. Melhuish was charged with one count of assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1) and (b). During a jury trial in the United States District Court for the Northern District of New York (Thomas J. McAvoy, *J.*), defense counsel chose not to offer any expert testimony regarding Melhuish's mental health condition and instead advanced a defense that Melhuish was attempting to perform a justified citizen's arrest of Caccavo. The jury returned a guilty verdict.

Melhuish now appeals from a judgment of conviction entered on February 21, 2019. She argues that (1) the district court erred by providing a written response to a jury note without affording the parties an opportunity to offer input

3

on the response; (2) the district court erred by orally instructing the jury to continue deliberations without sufficient cautions and guidance; and (3) she received ineffective assistance of counsel.

As to the district court's written jury note response and oral instruction, we conclude that the district court erred in both respects but that neither error rose to the level of plain error. As to Melhuish's ineffective assistance of counsel claim, we first conclude that the crime of assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1) and (b) is a general intent crime, and we therefore conclude that counsel's performance was not deficient insofar as counsel failed to offer evidence to show that she lacked specific intent. Nevertheless, we conclude that further fact-finding is necessary and that the district court must conduct a hearing regarding certain decisions of Melhuish's counsel, including the decision not to offer expert testimony regarding Melhuish's mental health condition with respect to an insanity defense. We therefore **REMAND** for a hearing regarding Melhuish's ineffective assistance of counsel claim.

## I. Background

### A. Melhuish's history of mental illness and delusions related to police

Melhuish has a long history of struggles with her mental health. She has been diagnosed with, *inter alia*, schizophrenia and schizoaffective disorder; post-traumatic stress disorder ("PTSD"); and brain bruising following a 2009 car accident in which she sustained a head injury.

Melhuish's mental health conditions have often led her to suffer from delusions. One of her frequent delusional beliefs is that police officers with ties to the occult and to pedophile rings are seeking to cause her physical harm. She has repeatedly received in-patient psychiatric treatment after reporting such delusions, and her symptoms have at times improved—but never fully resolved—with psychotropic medication.

### B. The criminal complaint

On September 18, 2017, the Government filed a criminal complaint charging Melhuish with assaulting, resisting, and impeding a federal officer in violation of 18 U.S.C. § 111(a)(1) and (b). The complaint alleged that, on or about the same date, a United States Border Patrol Agent approached Melhuish while she was

5

walking along the shoulder of a road during poor visibility conditions. After being asked for her identification, Melhuish reacted violently, spitting on the agent, biting him, and wrestling away his handcuffs before he and a county sheriff were finally able to subdue her.

A grand jury subsequently returned a superseding indictment containing the same charge.

## C.     Competency concerns

On October 3, 2017, at the request of defense counsel and with the consent of the Government, a magistrate judge committed Melhuish to the custody of the Attorney General for an examination to determine her mental competence to stand trial.

On December 27, 2017, government forensic psychologist Dr. Samantha DiMisa issued a report diagnosing Melhuish with a psychotic spectrum condition marked by persistent persecutory delusions. Dr. DiMisa's report detailed Melhuish's delusions that her arrest had resulted from efforts by law enforcement, including the Border Patrol Agent, to hunt her down and murder her in order to

6

prevent her from speaking out about their involvement in a pedophilic occultic group. Melhuish had explained to a psychiatrist during the competency evaluation that, on the night of her arrest, she had been traveling to see her son to warn him of certain premonitions she had had about pedophilia and the occult. She speculated that the Border Patrol Agent might have been spiritually possessed, might have been working with an ex-boyfriend of hers who she believed (due to a premonition) had raped a child, and might kill her son if she were to testify in her own defense. Dr. DiMisa concluded that, although Melhuish could define and understand certain basic legal concepts, she lacked a rational understanding of the proceedings against her and was incapable of assisting her legal counsel with her defense or adequately making decisions about legal strategy.

Melhuish's defense counsel, acting on her behalf, challenged the finding of incompetency. At an appearance before a magistrate judge, Melhuish delivered a speech about her views on Jesus Christ and attributed Dr. DiMisa's conclusions regarding her mental health to "a difference of spiritual beliefs." App'x at 38-39.

7

Both parties also filed written submissions. The Government took the position that it had no basis to object to Dr. DiMisa's opinion and requested that the magistrate judge hold a competency hearing.

On February 5, 2018, the magistrate judge conducted such a hearing. Dr. DiMisa testified, explaining that while Melhuish had an adequate "factual understanding"—enabling her to identify, for example, the roles of individuals in a courtroom—her delusions precluded an adequate "rational understanding" of the events of her arrest, including the "ability to rationally, logically, coherently, and purposely understand the nature of her charges and to be able to defend and represent herself adequately." *Id*. at 599-600. Dr. DiMisa noted that Melhuish had refused to take psychotropic medication during her evaluation and suggested that her condition could potentially be "mitigated or treated with medication." *Id*. at 603.

On February 9, 2018, notwithstanding Dr. DiMisa's conclusions and in the absence of any conflicting expert testimony, the magistrate judge issued an order holding that Melhuish was competent to stand trial. In reaching this conclusion,

the magistrate judge explained that he was relying in substantial part on Melhuish's and her counsel's representations regarding competency:

> While Dr. DiMisa has opined that defendant is not competent to stand trial because she lacks a rational understanding of the charges against her, *based upon the assertion by defendant and defendant's attorney that she is in fact competent to stand trial, and is fully capable of effectively aiding counsel in the defense of her case*, and the court's observation of defendant at the recent hearing and other court proceedings, taken together, I find that proceeding to trial at this stage will not violate defendant's constitutional right to a fair trial.

*Id*. at 66 (emphasis added). The magistrate judge thereafter conducted a detention hearing and ordered Melhuish's release pending trial.

This state of affairs did not last long: Less than two weeks after her release, Melhuish was admitted to the psychiatric emergency department of a hospital. Within a week of her hospital discharge, she was again arrested after refusing to leave a convenience store while mumbling incoherently and accusing police officers of sexual assault. The United States Probation Office also filed two declarations reporting that Melhuish had violated the conditions of her pretrial release and expressing concerns about "the depth of [Melhuish's] mental illness" and the absence of "a plan for her mental health treatment." *Id*. at 71-72. The

9

Government thereafter moved for reconsideration of Melhuish's competency. The magistrate judge denied this motion but revoked Melhuish's release.

On April 30, 2018, Melhuish's counsel filed a letter reporting that Melhuish's mental state had decompensated further in prison, that she had stopped eating and was experiencing hallucinations, and that she had once again been sent to an emergency room for mental health treatment. Defense counsel then expressed that she did not believe Melhuish currently was able to participate in her legal defense and requested further inquiry into Melhuish's competency. On May 3, 2018, the magistrate judge ordered that Melhuish be placed in the custody of the Attorney General pursuant to 18 U.S.C. § 4241, and then be returned to the court for another competency determination.

Approximately seven months later, on December 10, 2018, the court received a Certificate of Recovery from the Bureau of Prisons ("BOP"), which stated that Melhuish's mental state had improved such that she was competent to proceed to trial. The BOP based this conclusion on the evaluation of forensic psychiatrist Dr. Amor Correa, who opined that Melhuish, despite continuing to

suffer from significant delusions, was competent to stand trial because she was able to describe and rationally apply legal and court concepts to her case. Neither the Government nor Melhuish's counsel objected to the BOP evaluation, and Melhuish's counsel subsequently filed a letter stating that, in counsel's opinion, Melhuish was competent to stand trial.

**D.    Exclusion of testimony regarding Melhuish's mental health condition**

On January 23, 2019, the Government moved to exclude evidence or argument concerning Melhuish's purported insanity or the existence of a mental disease, defect, or condition. In response, Melhuish's counsel asserted "no objection to an order precluding the admission of expert testimony or evidence regarding Ms. Melhuish's mental condition" except for "brief testimony from Ms. Melhuish regarding a traumatic brain injury that she sustained in 2009 and her diagnosis of PTSD." *Id*. at 122. Melhuish's counsel maintained that "[t]his evidence is relevant to (1) her ability to testify; and (2) the defense theory that she acted in self-defense." *Id*.

11

The district court (Thomas J. McAvoy, *J.*) granted the Government's motion and precluded Melhuish from testifying about her PTSD or traumatic brain injury, concluding that such evidence required expert testimony.

**E.     Trial**

Melhuish's jury trial took place between February 4 and February 7, 2019. Melhuish's defense counsel did not attempt to offer any expert testimony regarding her mental health condition and did not advance any defense premised on her mental health condition.   Instead, counsel advanced the defense that Melhuish had used justified force against Border Patrol Agent Caccavo to defend herself from his unprovoked attack and to perform a citizen's arrest.  Both Caccavo and Melhuish testified at trial.

**1.     Caccavo's testimony**

Caccavo first testified regarding his violent altercation with Melhuish, providing details that strongly suggested Melhuish was in an altered mental state at the time of the incident.  Specifically, Caccavo described the events as follows:

He encountered Melhuish around one in the morning on an unlit stretch of road. When he pulled up in his marked Border Patrol truck with emergency lights flashing, Melhuish approached the vehicle. She was not wearing shoes. She appeared "very disheveled" and "in distress." *Id*. at 218.

Caccavo got out of his truck and approached Melhuish, who seemed "a bit nervous or maybe paranoid." *Id*. at 221. He asked for her identification, but Melhuish refused to provide her ID, telling Caccavo that he would "contaminate it." *Id*. at 222-23. Caccavo initially told her that she could hold up her ID for him so he would not have to touch it, but after Melhuish held the ID upside down and started moving her hand around, Caccavo reached out to steady the ID. Melhuish jumped back and began "cursing a lot" and "saying a lot of gibberish," repeatedly spat on her own arm, and then spat in Caccavo's face. *Id*. at 224-25.

Caccavo told Melhuish she was under arrest for assaulting him, and he attempted to restrain her. She reacted by pushing him, "grappling" with him, and yelling at him. *Id*. at 229. When she yelled, "[s]ome words were English" and "[s]ome were not." *Id*. at 230. Melhuish then "charged" Caccavo, telling him,

13

"You're under arrest. I'm arresting you." *Id*. at 231. A struggle ensued, during which she bit him three times, repeatedly told him he was under arrest, and wrestled away his handcuffs.

Caccavo fended her off by hitting her repeatedly with his baton. She continued to shout nonsensically at him, speaking in gibberish and accusing him of being "the devil" and "part of the great cabal to eat babies." *Id*. at 241-43. Finally, a county sheriff arrived, threatened Melhuish with a taser, and assisted Caccavo with arresting her.

### 2. Melhuish's testimony

Following Caccavo's testimony, Melhuish's counsel again sought to introduce testimony from Melhuish regarding her traumatic brain injury, arguing that this would be relevant to make sure the jury did not suspect Melhuish had been on drugs at the time of the incident. The district court reasserted its prior ruling that Melhuish could not testify as to her medical diagnoses but noted that Melhuish could testify that she was not on drugs.

Melhuish then testified in her own defense, describing the relevant events as follows:

On the night in question, she had decided to walk on foot from Syracuse, New York, to Watertown, New York, in order to explore the area and to visit her nine-year-old son, who was currently living there with his father. (The Court takes judicial notice of the fact that the distance between Syracuse and Watertown is approximately seventy miles. *See Brisco v. Ercole*, 565 F.3d 80, 83 n.2 (2d Cir. 2009) (taking judicial notice of distance as reported by online maps).)

Melhuish was able to hitchhike for parts of the journey, but by the time she encountered Caccavo she had been walking for what "felt like . . . five or six hours," although she was uncertain of exactly how long because she "didn't have a watch" and her "phone had ended up in water." App'x at 377. She was barefoot at the time of the encounter because her feet had started to blister and she had decided to remove and carry her shoes.

Caccavo arrived in what she recognized as a Border Patrol vehicle. He made her "anxious" by asking to see her ID and "startled" her when he reached out to

15

touch it even after she told him she was a "germaphobe." *Id.* at 381. She spit on her wrist and wiped it on her pants because she did not "want [Caccavo's] energy on [her]." *Id.* at 382. She then felt "severely weirded out by that moment" so she decided to pray in "tongues." *Id.* Using this "prayer language," she "allow[ed] the spirit to intervene because [she] felt like, God, something is not right here." *Id.* at 382-83.

When she concluded her prayer, Caccavo abruptly ran at her and grabbed for her throat. She used "self-defense" training to "block" him, scratching him in the process. *Id.* at 383. After they physically fought for a while, she said to Caccavo, "'[I]s there any way we can get back to normal?'" *Id.* at 384. When he replied that she was under arrest, she responded, "'How can you arrest me if you attacked me? If anyone's arresting anyone, I'm arresting you under citizen's arrest.'" *Id.* He took out his handcuffs and she said, "'Sir, I'm taking those handcuffs from you and I'm putting them on you and I'm taking you to jail.'" *Id.*

They then grappled more, during which time Caccavo asked her whether she was going to bite him. She "took his advice and bit his kneecap," saying,

16

"Thanks for the idea." *Id*. at 385. As the struggle continued, Melhuish succeeded in taking Caccavo's handcuffs, and he hit her repeatedly with his baton until the sheriff arrived and took her into custody.

### 3.    The district court's jury note responses

On February 6, 2019, the district court charged the jury. Later that day, the court received a jury note stating, "as of 3:30 p.m., the jury is not able to come to a unanimous decision as to a verdict." *Id*. at 504. The district judge did not come into the courtroom to read this note to the parties. Instead, the clerk came alone to the courtroom and stated as follows:

> We did receive a jury note as of 3:30 p.m. that stated, "As of 3:30 p.m., the jury is not able to come to a unanimous decision as to a verdict."
>
> The judge has responded in writing and asked that I share it with you before providing it to the jury. The judge's response to the foreperson is, "Please continue to deliberate until you have reached a unanimous verdict. If you need help on anything, please ask."
>
> So with that, I'm going to pass this, which has been marked as jury note No. 2, to the foreperson. Thank you. The judge will not take the bench at this time.

*Id*. The clerk did not ask either party whether there were any objections to the district court's response.

Later in the day, the district court took the bench to read a different jury note to the parties. While doing so, the district court asked the parties whether they were aware of the previous jury note to which the court had already responded in writing. Both parties responded that they were aware.

On the morning of February 7, 2019, the court expressed an intention to give a charge pursuant to *Allen v. United States*, 164 U.S. 492 (1896). Melhuish's counsel asked the district court whether the parties were "going to see the *Allen* charge before the Court gives it." App'x at 527. The district court refused this request, stating:

> No. You're not going to see it. The hell you want to see it for? It's a standard *Allen* charge. It tells them, look. You folks were sworn as jurors in this case to reach a verdict, and you have to reach a verdict based on the evidence. And there's no reason to believe that 11 other jurors or 12 other jurors are going to be able to decide this any better than you people will decide it. You heard the evidence. That's basically what it says. Get back in there and go to work.
> There's nothing in there that's different than what you have heard and I have heard for years and years. It's the same old charge.

*Id.* Melhuish's counsel asked the court whether the charge would "also tell them that they don't have to give up their conviction or position if it would go against

18

what they believe?" *Id*. The district court responded that it did not know whether the charge would include this caution.

Moments later, the district court brought in the jury and made the following statement:

> Once more, I remind you that you have to be unanimous in your verdict. It's important that each of you consider the case individually, discuss it among yourselves. You don't have to give up your individual beliefs as you hold them, but you can examine the logic of both sides and try to work out a disposition that will accommodate everybody's beliefs after hearing all of the evidence.

*Id*. at 528.

A few minutes later, the district court received a note from the jury stating that it had reached a verdict. The jury returned a guilty verdict.

### F.    Sentencing

On February 19, 2019, the district court sentenced Melhuish to time served (totaling 500 days) and one year of supervised release. The district court also stated to Melhuish at time of sentencing:

> I talked to the jury after its verdict and they were very concerned about you. They were worried about you. They didn't want to do you any injustice, but they felt you technically breached the law as the law

stands and that's the reason they returned the verdict but it wasn't to say they didn't appreciate what you told them, because they did. I think that's important for you to know.

*Id*. at 631.

This appeal followed.

## II. Discussion

On appeal, Melhuish argues that (1) the district court erred in its written response to the jury note; (2) the district court erred in its oral instruction to continue deliberations; and (3) she received ineffective assistance of counsel. We address each argument in turn.

### A. The district court did not plainly err in its written response to the jury note.

Because Melhuish challenges the written response to the jury note for the first time on appeal, we review this argument for plain error. *See United States v. Rosa*, 957 F.3d 113, 117 (2d Cir. 2020). To demonstrate plain error, Melhuish must establish the following four elements:

> (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id*. at 117-18 (internal quotation marks omitted).

Here, as the Government concedes, Melhuish easily establishes the first two elements of the plain-error standard—that is, that the district court erred, and that the error was obvious. "A defendant in a criminal case has the right, rooted in the Sixth Amendment Confrontation Clause and Fifth Amendment Due Process Clause, to be present at every trial stage." *United States v. Mehta*, 919 F.3d 175, 180 (2d Cir. 2019) (internal quotation marks omitted). This right yields a requirement "that messages from a jury should be disclosed to counsel *and that counsel should be afforded an opportunity to be heard before the trial judge responds*." *Id*. (emphasis added) (internal quotation marks omitted).[1] A district court "should not respond to a jury note in an *ex parte* manner because such communications are pregnant with possibilities for error and unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views."

---

[1] *See also United States v. Mejia*, 356 F.3d 470, 474 (2d Cir. 2004) ("[W]e [have] emphasized the importance of the input of counsel in a court's response to jury messages.").

*Id.* at 181 (internal quotation marks omitted).  We have specifically delineated the

"practices to be followed when the district court receives an inquiry from a jury"

as follows:

> (1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it.

*Id.* at 180–81 (internal quotation marks omitted).  Here, in sending a note back to

the jury without even entering the courtroom, let alone offering the parties a prior

opportunity to weigh in on the contents of the response, the district court

obviously failed to follow these procedures.

The third prong of the plain-error inquiry, however, presents a stumbling

block for Melhuish, as she fails to establish that the district court's error affected

her substantial rights.  In certain rare cases we have found sufficient prejudice after

a district court communicated privately with a jury without providing counsel an

opportunity for input.  But we have done so only where the contents of the

communications were far more prejudicial.  For example, in *United States v. Mehta*,

22

on which Melhuish relies, the district court met privately with several jurors who expressed concerns that the defendants were lingering outside the courthouse while the jurors left. *Id*. at 178. The district court responded that the jurors' reports were "disturbing," stated that "once in a while you get somebody that acts inappropriate like that," and assured jurors that security officers would be assigned. *Id*. These remarks were clearly more harmful than the note at issue here because they indicated the district court's personal views of the defendants. *See id.* at 181 ("[T]he judge's comments to the jurors strongly implied that the defendants posed some threat of physical danger to the jurors. . . . Had defense counsel been given an opportunity to respond, they likely would have provided an alternative account of the circumstances, and one that could well have fully addressed the jurors' perceived safety concerns.").

Melhuish argues that the prejudicial aspect of the district court's note is what it does *not* contain—that is, the appropriate cautions accompanying a so-called "*Allen* charge." An *Allen* charge is a type of supplemental instruction that a district court may give after receiving notice that a jury is deadlocked. The *Allen*

23

charge "urges the jurors to continue deliberations in order to reach a verdict." *United States v. Vargas-Cordon*, 733 F.3d 366, 377 (2d Cir. 2013) (internal quotation marks omitted). The name is derived from *Allen v. United States*, 164 U.S. 492 (1896), in which the Supreme Court authorized "balanced instruction by the court to a deadlocked jury, urging continued deliberations to reach agreement if possible, but with a reminder that a juror may not cast a vote for a verdict against his conscientiously held individual belief." *Krische v. Smith*, 662 F.2d 177, 180 n.1 (2d Cir. 1981). "[P]rejudice . . . can result when a jury is told to keep deliberating, but given no guidelines as to the balance required in the deliberations." *Id.* at 180.

We find Melhuish's *Allen* argument unpersuasive. To be sure, the district court's note initially—and problematically—encouraged continued deliberations without an admonition that jurors should maintain their individual views. But the district court added an appropriate caution shortly thereafter in the oral instruction given the following morning, stating: "It's important that each of you consider the case individually, discuss it among yourselves. You don't have to give up your individual beliefs as you hold them . . . ." *Id.* at 528. Under the specific

24

circumstances of this case, we do not think the temporal gap between the instruction to continue deliberating and the instruction not to relinquish individual beliefs is sufficiently prejudicial to satisfy the third prong of the plain-error standard.

Accordingly, while we agree that there is error here, we do not find plain error warranting vacatur of the conviction.

**B.     The district court did not plainly err in its oral instruction to the jury.**

Because Melhuish also failed to raise below her challenge based on the district court's oral instruction (which the court did not permit the parties to review in advance), we also review this argument for plain error. *Rosa*, 957 F.3d at 117.

Once again, Melhuish establishes that the district court erred and that the error was obvious, satisfying the first two elements of the plain-error analysis. We have "repeatedly held that defense counsel should be afforded the opportunity to review a proposed jury instruction." *United States v. Henry*, 325 F.3d 93, 106-07 (2d Cir. 2003). We have instructed in particular that it is "inappropriate" for a district

25

court to "refus[e] to allow defense counsel to review and comment upon" proposed *Allen* instructions. *United States v. Ruggiero*, 928 F.2d 1289, 1300 (2d Cir. 1991). Here, in expressly denying defense counsel's request for an opportunity to review the proposed charge, the district court obviously ran afoul of our instructions.

However, just as with respect to the district court's written response to the jury note, Melhuish fails to establish an effect on her substantial rights. As noted above, in assessing the propriety of an *Allen* charge, the critical question is "whether it tends to coerce undecided jurors into reaching a verdict—that is, whether the charge encourages jurors to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." *Vargas-Cordon*, 733 F.3d at 377 (internal quotation marks omitted). Here, critically, the district court's oral instruction included a caution to jurors that they did not have to relinquish individual beliefs. *See Smalls v. Batista*, 191 F.3d 272, 279 (2d Cir. 1999) ("[A] necessary component of any *Allen*-type charge requires the trial judge to admonish the jurors not to surrender their own conscientiously held beliefs."); *cf.*

26

*Vargas-Cordon*, 733 F.3d at 378 (holding that an *Allen* charge was proper where "the district court repeatedly warned the jurors not to surrender their conscientiously held beliefs, which is an instruction we have previously held to mitigate greatly a charge's potential coercive effect").

Thus, while the district court erred in failing to follow proper procedures with respect to its oral instruction, this was not plain error warranting vacatur of the conviction. *Cf. Henry*, 325 F.3d at 108 (although "the district court should have afforded defense counsel the opportunity to review the *Allen* charge before administering it to the jury," vacatur was unnecessary because the defendant "fail[ed] to demonstrate that he was prejudiced by the district court's error").

**C.** **We remand for further fact-finding by the district court on the issue of whether Melhuish received ineffective assistance.**

We review Melhuish's ineffective assistance of counsel claim *de novo*. *See United States v. Kaid*, 502 F.3d 43, 45 (2d Cir. 2007).

The Sixth Amendment "guarantees the right to *effective* assistance of counsel." *United States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020). The standard by which a defendant must establish ineffective assistance is "rigorous" and

"presents a high bar" because courts apply "a presumption of effective performance." *United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020) (internal quotation marks omitted). As articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), the standard has two prongs, one focusing on attorney performance and the other on prejudice.

First, the defendant must demonstrate that, "in light of all the circumstances, the acts or omissions of trial counsel were outside the wide range of professionally competent assistance." *Nolan*, 956 F.3d at 79 (internal quotation marks omitted). "Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." *Gibbons v. Savage*, 555 F.3d 112, 122 (2d Cir. 2009). However, a defendant may establish that counsel made "omissions that cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness." *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (internal quotation marks and alteration omitted).

Second, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Nolan*, 956 F.3d at 79 (internal quotation marks omitted). "[A] reasonable probability of a different result is a probability sufficient to undermine confidence in the outcome." *Mazzuca*, 570 F.3d at 502 (internal quotation marks omitted). This "prong can be satisfied even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. (internal quotation marks omitted); *see DeLuca v. Lord*, 77 F.3d 578, 590 (2d Cir. 1996) (stating that the ineffective assistance of counsel standard "does not require certainty that the result would have been different").

When reviewing a claim of ineffective assistance of counsel, this Court may take one of three potential courses of action:

> (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before [the Court].

*United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003). Where "the record before us is not adequately developed to allow us to decide the claim based upon it, our choice of the manner in which the claim will be resolved is limited to the first two . . . options: dismissal in favor of the defendant bringing a section 2255 motion, or remand to the district court for further factfinding on the issue." *United States v. Doe*, 365 F.3d 150, 152 (2d Cir. 2004).

Melhuish's ineffective assistance claim focuses on her defense counsel's failure to offer expert testimony regarding her mental health. In seeking to establish that this failure was both outside the range of professionally competent assistance and had a reasonable likelihood to be outcome-determinative in her case, Melhuish contends that mental health evidence would have served two critical purposes at her trial. First, she argues that such evidence would have supported an argument that she lacked the specific intent to commit an offense under 18 U.S.C. § 111. Second, she argues that the mental health evidence would have supported an affirmative defense. As explained below, we find the first

argument unpersuasive but conclude that the second requires further development of the record.

> ### 1. Use of mental health evidence to establish a lack of specific intent

Melhuish's first argument requires us to consider, in the first instance, whether 18 U.S.C. § 111 is a general intent crime or a specific intent crime. For a general intent crime, the Government ordinarily must prove that a defendant had "at least an intention to make the bodily movement which constitutes the act which the crime requires." *United States v. Sewell*, 252 F.3d 647, 650 (2d Cir. 2001) (internal quotation marks omitted). For a specific intent crime, the Government also must prove "a special mental element particular to the crime with which defendant is charged." *Id*. (internal quotation marks omitted). A defendant may "submit[] mental health evidence for the purpose of rebutting the prosecution's proof of the *mens rea* element of a specific intent crime." *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006).

Section 111 subjects to criminal liability anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" certain federal officials.[2] "Congress's purpose in enacting § 111 was both to deter harm to certain federal officials and to deter interference with their law enforcement activities." *United*

---

[2] Section 111 provides in full:

(a) In general.--Whoever--

> (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or

> (2) forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

(b) Enhanced penalty.--Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111.

*States v. McIntosh*, 753 F.3d 388, 393 (2d Cir. 2014) (internal quotation marks omitted). "In order to protect the law enforcement function itself, the statute must be read as prohibiting any acts or threats of bodily harm that might reasonably deter a federal official from the performance of his or her duties." *Id.* (internal quotation marks omitted).

We hold that § 111 is a general intent crime. This conclusion comports with the Supreme Court's statement in *United States v. Feola* that, "in order to incur criminal liability under § 111 an actor must entertain *merely* the criminal intent to do the acts therein specified." 420 U.S. 671, 686 (1975) (emphasis added); *see United States v. Kleinbart*, 27 F.3d 586, 592 (D.C. Cir. 1994) (finding this language in *Feola* "conclusive" on the question of whether § 111 is a general intent crime).[3] Our interpretation of § 111 as a general intent crime also comports with Congress's

---

[3] In *Feola*, the Supreme Court declined to construe § 111 "as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer," concluding that "[a]ll the statute requires is an intent to assault, not an intent to assault a federal officer." 420 U.S. at 684. The Supreme Court reasoned that "[a] contrary conclusion would give insufficient protection to the agent enforcing an unpopular law, and none to the agent acting under cover." *Id.*

broad objective to deter interference with federal officers. *See United States v. Jim*, 865 F.2d 211, 214-15 (9th Cir. 1989) ("Congress intended to maximize protection for officers and ensure that those who kill or assault federal officers are prosecuted. . . . Applying a general intent test well serves that purpose."); *cf. Feola*, 420 U.S. at 684 (recognizing that an interpretation of § 111 should "effectuate the congressional purpose of according maximum protection to federal officers").

Melhuish argues that § 111 is a specific intent crime because it requires "willful" conduct. She points to the statute's use of the term "simple assault," which we defined in *United States v. Chestaro* as, under common law, "a crime committed by either a *willful* attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." 197 F.3d 600, 605 (2d Cir. 1999) (emphasis added) (internal quotation marks omitted).

The problem with Melhuish's argument is that a requirement of "willfulness" does not necessarily denote a specific intent crime. We have

34

observed that "[t]he principal challenge in interpreting 'willfully' in a criminal statute is determining whether the term indicates general or specific intent." *United States v. George*, 386 F.3d 383, 390 (2d Cir. 2004).[4] "[W]illful . . . is a word of many meanings, its construction often being influenced by its context." *Spies v. United States*, 317 U.S. 492, 497 (1943). For example, in *Ratzlaf v. United States*, the Supreme Court held that the term "willfully" in the then-effective version of 31 U.S.C. § 5324 required a showing "that the defendant acted with knowledge that his conduct was unlawful." 510 U.S. 135, 137 (1994).[5] In contrast, in *United States v. Georgopoulos*, this Court held that the term "willfully" in 29 U.S.C. § 186 required "only a finding of general intent" and not a finding that defendants "acted with bad purpose and with knowledge that their conduct was unlawful." 149 F.3d 169, 171-72 (2d Cir. 1998). In a more closely analogous case, *United States v. Delis*, we

---

[4] *See George*, 386 F.3d at 389 ("Divining the meaning of 'willfully' in criminal statutory *mens rea* terms has long bedeviled American courts.").

[5] "Soon after *Ratzlaf* was decided, however, Congress amended § 5324 by giving it its own criminal penalty provision so that reliance on § 5322 is no longer necessary. This new provision does not include a separate requirement that the defendant act 'willfully' to be convicted." *United States v. Taylor*, 816 F.3d 12, 23 n.11 (2d Cir. 2016) (internal quotation marks omitted).

acknowledged that *Chestaro* had defined "simple assault" as requiring "willful[ness]" but concluded that, to commit "simple assault" under 18 U.S.C. § 113, a defendant need not have a specific intent to injure. 558 F.3d 177, 183 (2d Cir. 2009).

Ultimately, given the malleability of the term, the mere appearance of "willfully" in the usual common-law formulation of simple assault, as incorporated into the definition of § 111, cannot meaningfully guide our analysis of the mental state required.[6] Considering the context of the statute, and aligning

---

[6] At Melhuish's trial, the district court instructed the jury in relevant part as follows:

> [T]he government must prove beyond a reasonable doubt . . . that the defendant committed the act or acts charged in the indictment willfully. In other words, you must be persuaded that the defendant acted voluntarily and intentionally and not by mistake or accident.

App'x at 453. We see no error in these instructions. (Nor does Melhuish challenge the instructions themselves.) We note, however, that district courts may find it helpful in future to omit the term "willfully" from jury instructions in § 111 cases. The word may obscure even more than it illuminates. It would be simpler, for example, to instruct the jury:

> The government must prove beyond a reasonable doubt that the defendant committed the act or acts charged in the indictment voluntarily and intentionally and not by mistake or accident.

with other Circuits to consider the issue,[7] we reject Melhuish's position that a conviction under § 111 requires proof of specific intent. We therefore cannot conclude that Melhuish's counsel was ineffective for failure to introduce expert mental health evidence to demonstrate her lack of specific intent.

---

[7] The Fourth, Sixth, Seventh, Eighth, and Eleventh Circuits have all held that § 111 is a general intent crime. *See United States v. Brown*, 592 F. App'x 164, 166 (4th Cir. 2014) ("Specific intent to violate the statute is not required to be convicted under 18 U.S.C. § 111."); *United States v. Kimes*, 246 F.3d 800, 802 (6th Cir. 2001) ("Joining the majority of circuits that have expressed an opinion on the matter, we conclude . . . that assault on a federal officer is a general intent crime."); *United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir. 1998) ("[W]e join other circuits in holding that § 111 is a general intent crime."); *United States v. Gustus*, 926 F.3d 1037, 1040 (8th Cir. 2019) ("The district court did not err in preventing [the defendant] from presenting a voluntary-intoxication defense. Such a defense is unavailable to defendants being charged with violating 18 U.S.C. § 111(a)(1) because assaulting a federal employee is a general-intent crime." (internal quotation marks and alteration omitted)), *cert. denied*, 141 S. Ct. 130 (2020); *United States v. Bates*, 960 F.3d 1278, 1289 (11th Cir. 2020) ("§ 111 is a general intent crime regardless of the subsection at issue.").

The First, Fifth, and Tenth Circuits have issued decisions with language arguably suggesting a specific intent requirement, but none of these decisions directly analyzed whether § 111 is a specific or general intent crime such that a defendant can offer evidence to negate the *mens rea* element. In *United States v. Caruana*, a district court in the First Circuit instructed a jury that, to violate § 111, the defendant must have "specific intent." 652 F.2d 220, 223 (1st Cir. 1981). On appeal, the parties did not dispute whether § 111 was a specific or general intent crime, only whether the evidence sufficed to satisfy the charge. The First Circuit found sufficient evidence without addressing the intent issue. *Id.* In *United States v. Taylor*, the Fifth Circuit found no error in a supplemental jury instruction on the "willful intent" required to violate § 111 and noted that "the appellant's defense was lack of specific intent." *United States v. Taylor*, 680 F.2d 378, 381 (5th Cir. 1982). Just as in *Caruana*, the parties did not dispute whether § 111 was a specific or general intent crime and therefore the Fifth Circuit did not analyze this point. In *United States v. Simmonds*, the Tenth Circuit referred to a § 111 offense as a "'specific intent' crime[]" where that point appeared to be undisputed by the parties. *See* 931 F.2d 685, 687 (10th Cir. 1991).

37

## 2. Use of mental health evidence to support an affirmative defense

We turn next to Melhuish's second argument, that the evidence of her mental health condition could have established an affirmative defense.

Melhuish argues that the mental health evidence would have supported her defense that she was justified in using physical force against Caccavo. "Because the law pertaining to self-defense is a matter of federal common law, we find it appropriate to look to state court decisions for guidance . . . ." *United States v. Desinor*, 525 F.3d 193, 199 (2d Cir. 2008) (internal citation omitted). "The leading New York cases construing the justification defense establish a subjective and an objective component: The fact-finder must determine that the defendant believed . . . physical force was necessary and that a reasonable person would have believed the use of . . . physical force was necessary under the same circumstances." *Jackson v. Edwards*, 404 F.3d 612, 623 (2d Cir. 2005) (internal

citation omitted). [8] Here, it is not immediately apparent how mental health evidence could have provided strong support for this defense. While such evidence could conceivably demonstrate that Melhuish had a subjective belief that she had to use physical force to defend herself, it is hard to see how the evidence could also demonstrate that her belief was objectively reasonable.

Yet even the selection of the justification defense raises some questions about the effectiveness of representation. The sole evidence in support of Melhuish's argument that she was lawfully defending herself and making a justified citizen's arrest of Caccavo was her own testimony that—during her

---

[8] *See* NYPL § 35.15 ("A person may . . . use physical force upon another person when and to the extent he or she *reasonably* believes such to be necessary to defend himself . . . from what he or she *reasonably* believes to be the use or imminent use of unlawful physical force by such other person . . . ." (emphasis added)); *see also Matter of Y.K.*, 87 N.Y.2d 430, 433 (1996) ("Generally, the force permitted is related to the degree of force *reasonably* believed necessary to repel various threats." (emphasis added)); *People v. Goetz*, 68 N.Y.2d 96, 115 (1986) (justification defense has both objective and subjective components); *cf. Brown v. Artuz*, 124 F.3d 73, 81 (2d Cir. 1997) ("Under New York law, a defendant can use deadly force to defend himself only if, among other things, (1) he subjectively believes that the use of deadly force is necessary, (2) a reasonable person in defendant's position would believe that the use of deadly force is necessary, and (3) the defendant does not know that he can with complete safety as to himself and others avoid the necessity of using deadly force by retreating." (internal quotation marks and alterations omitted)).

attempted 70-mile walk (barefoot and without a phone or watch)—Caccavo attacked her, for no identified purpose, after getting his "energy" on her and witnessing her prayer. App'x at 382-83. The testimony itself raised questions about Melhuish's ability to rationally process information and make decisions about her personal safety. And the selection of a justification defense premised on this testimony is particularly disquieting given the potential availability of another complete defense—one more squarely premised on Melhuish's documented mental health condition.

Specifically, expert mental health testimony could have provided compelling support for an affirmative defense of insanity. Under 18 U.S.C. § 17, a defendant may assert an affirmative defense to prosecution where, "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." The defendant must prove this defense "by clear and convincing evidence." *Id.*; *accord United States v. Ventrilla*, 233 F.3d 166, 169 (2d Cir. 2000).

Here, Dr. DiMisa's report strongly suggests that, with the support of expert mental health testimony, Melhuish could have demonstrated that, because her psychotic delusions led her to perceive Caccavo as attempting to murder her (based on his involvement in a pedophilic occultic group), she was unable to appreciate that it would be wrong to fight back when he tried to restrain her. Other trial testimony presented by both parties could have supported this defense. As detailed in Caccavo's testimony, Melhuish was evincing signs of significant mental illness on the night in question, appearing paranoid and disheveled and accusing him of being part of a baby-eating cabal. And, as Melhuish testified, she believed she had to engage in physical self-defensive maneuvers because she perceived Caccavo as assaulting her.

The district court's statement at time of sentencing that, following the verdict, jurors expressed that they were "worried about" Melhuish but felt "technically" bound to conclude she breached the law, also provides some circumstantial support for the notion that the jury might have found an insanity defense compelling. App'x at 631; *cf. DeLuca*, 77 F.3d at 590 (district court properly

41

found ineffective assistance where counsel failed to prepare an "extreme emotional disturbance" defense and there was "a high likelihood that the jurors, or at least some of them, would have accepted" testimony supporting the defense). Yet Melhuish was never able to offer her potentially quite strong insanity defense because evidence of her mental health condition was never placed before the jury.

The Government argues that there were strategic reasons why Melhuish's counsel might have chosen not to introduce any evidence of her mental health condition or raise an insanity defense. The record does not allow us to discern how defense counsel arrived at these decisions, but we are still left with concerns: First, as explained above, the strategic nature of forgoing an insanity defense is not immediately apparent given the problematic evidentiary support offered for the justification defense. Second, defense counsel did not actually make an intentional strategic decision not to bring any mental health evidence before the jury. Rather, defense counsel *did* try to introduce mental health evidence but sought to do so through an improper witness. Melhuish, as a lay witness, could not introduce the evidence of her own mental health diagnoses, *see* Fed. R. Evid. 701 (lay witness

testimony cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702"), and Melhuish's counsel failed to offer the proper testimony of an expert. Thus, Melhuish's counsel's failure to bring any expert mental health evidence to the jury's attention is particularly troubling not only because it could have supported a significantly more plausible defense than the one offered but also because the utter absence of any such evidence might have resulted from counsel's misunderstanding of the Federal Rules of Evidence.

This Court has previously held that a failure to offer expert testimony can, in some unusual contexts, constitute ineffective assistance. Although "there is no *per se* rule that requires trial attorneys to seek out an expert," where the Government's case "rested centrally" on an issue for which defense counsel failed to offer expert testimony, it may become "clear that . . . such a failure was not justified as an objectively reasonable strategic choice." *Gersten v. Senkowski*, 426 F.3d 588, 608-09 (2d Cir. 2005) (internal quotation marks and alteration omitted) (finding defense counsel ineffective based on failure to call medical expert in child sexual abuse case); *see also Nolan*, 956 F.3d at 81 (finding defense counsel ineffective

43

based on, *inter alia*, failure to call expert on unreliability of eyewitness identifications).  We are concerned, but by no means yet convinced, that this might be one such case.

Of course, we recognize that all of defense counsel's decisions might have perfectly reasonable strategic justifications that leave the quality of this representation well within the bounds of the Sixth Amendment.  Such justifications are simply not clear from the record before us.  In particular, we understand that counsel may have selected a theory of defense at Melhuish's insistence, perhaps even over counsel's objection.  But questions remain as to whether Melhuish was competent to play this guiding role in her own defense. Serious competency issues punctuated the early stages of this prosecution.  And defense counsel notably chose not only to challenge Dr. DiMisa's conclusions as to Melhuish's incompetency but also not to challenge or request further evaluation following the BOP's certification of competency.  The strategic nature of defense counsel's competency-related decisions, too, cannot be discerned on the record before us.

An insufficient record leaves, as noted above, two options for the Court: decline to hear the claim and permit a § 2255 motion, or remand for fact-finding in the district court. "[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Nolan*, 956 F.3d at 84 (internal quotation marks omitted). Here, however, the defendant has already been released from custody and thus complex questions may arise regarding the availability of a § 2255 motion or other procedural vehicle to raise an ineffective assistance claim. Under the rare circumstances of this case, in the exercise of our discretion we conclude that a remand will best serve judicial efficiency.

On remand, the district court must develop the record as to communications between Melhuish and her counsel, as well as any of counsel's strategic reasoning. The district court should focus its inquiry in substantial part on defense counsel's decisions (a) not to offer expert testimony regarding Melhuish's mental health condition, (b) to advance a justification defense rather than an insanity defense, and (c) to argue that Melhuish was competent to participate meaningfully in her own defense. This will require a fact-finding hearing. Further, it will require a

medical evaluation of Melhuish, both to address the competency issues and to establish what evidence defense counsel could potentially have used at trial. The district court should then individually consider both prongs of the ineffective assistance inquiry and determine whether the record reveals deficient performance that prejudiced the defendant.

We note, again, that the record is currently insufficient for us to determine these issues and that we express in this opinion no actual conclusions as to the effectiveness of defense counsel's performance in this case.

## III. Conclusion

In sum, we hold as follows:

1. The district court did not plainly err in its written jury note response. Although the district court committed an obvious error in denying the parties an opportunity to weigh in on the contents of the written response, Melhuish fails to demonstrate that this error affected her substantial rights.

2. The district court did not plainly err in its oral instruction to the jury. The district court committed an obvious error in refusing to allow the parties to review

the contents of the *Allen* charge, but once again Melhuish fails to demonstrate that this error affected her substantial rights.

3.  The offense of assaulting a federal officer under 18 U.S.C. § 111 is a general intent crime.

4.  The current record is insufficient to resolve Melhuish's ineffective assistance claim.  The district court must obtain a medical evaluation of Melhuish and conduct a fact-finding hearing regarding certain key decisions of Melhuish's counsel, including the decisions: (a) not to offer expert testimony regarding Melhuish's mental health condition, (b) to advance a justification defense rather than an insanity defense, and (c) to argue that Melhuish was competent to participate meaningfully in her own defense.

We therefore **REMAND** for a hearing regarding Melhuish's ineffective assistance of counsel claim.